The CONTINENTAL INSURANCE COMPANY, a New Hampshire insurance company, and the Fidelity and Casualty Company of New York, a New Hampshire insurance company, Plaintiffs,

v.

RUTLEDGE & COMPANY, INC., a Delaware corporation, and John Rutledge, individually, Defendants.

Rutledge & Company, Inc.,
Counterclaim–
Plaintiff,

v.

The Continental Insurance Company, the Fidelity and Casualty Company of New York, and CNA Financial Corporation, Counterclaim–Defendants.

C.A. No. 15539.

Court of Chancery of Delaware,
New Castle County.

Submitted: Oct. 15, 1999.
Decided: Jan. 10, 2000.

David C. McBride and Martin S. Lessner, of Young Conaway Stargatt & Taylor, LLP, Wilmington, for Plaintiffs.

Stephen E. Herrmann, of Richards Layton & Finger, LLP, Wilmington; of Counsel: Andrew W. Goldwater and Hal Neier, of Friedman Kaplan & Seiler, LLP, New York City, for Defendants.

## OPINION

CHANDLER, Chancellor.

This case involves a dispute between a limited partner and the general partner of a Delaware limited partnership. The parties ask the Court to resolve the following two issues. One, does the limited partnership agreement permit limited partners to withdraw at will, or did the parties orally amend the agreement to suspend temporarily the limited partners' withdrawal rights? Two, does the limited partnership agreement permit the general partner to receive fees directly from portfolio companies? These issues are before the Court on cross-motions for summary judgment.

### I. FACTUAL BACKGROUND

Individual defendant John Rutledge is an experienced economist who has advised hundreds of companies regarding their financial affairs. He served as an economic advisor to both Presidents Ford and Rea-

gan. One of Rutledge's advisee companies was plaintiff Continental Insurance Company ("Continental"). Not long after he began his relationship with Continental in 1981, Charles Parker, the Chief Investment Officer of Continental Asset Management ("CAM"), and Gerald Bollman, an executive Vice President of CAM, and Rutledge began considering joining forces to form an investment fund. Their collaboration resulted in the formation of John Rutledge Partners ("JRP"), a limited partnership designed to raise and invest capital. The general partner of JRP was Rutledge & Company, Inc. ("RCI", of which John Rutledge is apparently the sole shareholder). Continental was a limited partner in JRP.

Section 23 of the JRP limited partnership agreement (the "Agreement") enabled a limited partner to withdraw from the partnership at will as long as the limited partner provided timely notice. If a limited partner withdrew, the general partner was to pay such limited partner according to its capital account. At issue here is RCI's claim that the parties orally amended the Agreement to reflect a promise by limited partner Continental to temporarily forgo its withdrawal rights.

Section 18 of the Agreement permitted RCI to engage in business outside the limited partnership.[1] Rutledge's outside business interests, particularly as they related to companies in which JRP invested, are the second subject of this litigation.

Initially, JRP planned to invest in public equity but switched to a private equity investment strategy mid-stream. At the same time that RCI, in its role as general partner of JRP, was negotiating private equity investments with potential portfolio companies, it was also collecting fees from the same companies. It collected these fees solely in its capacity as RCI and not on behalf of the JRP limited partnership.

Continental and RCI initially agreed that JRP would invest in public equity because Rutledge maintained advisory relationships primarily with public companies. Continental was to infuse the portfolio companies with capital, and Rutledge would provide the companies with a financial strategy in order to improve its performance. The improved performance would increase the value of the limited partnership's investment in that company.

As indicia of the partners' intentions, the parties attached appendices to the Agreement discussing JRP's investment strategy. In pertinent part, the operations section of Schedule B to the Agreement provides:

> We anticipate that the Partnership will ... invest in situations only where there is a clear exit for the Partnership. This implies restricting the Partnership's investment activities to either a) marketable securities, or b) private securities which contain provisions allowing the Partnership to put the investment back to the company with predetermined time and valuation parameters.

Although Schedule B reflects what Continental and RCI "anticipate" and what the Agreement "implies," the Agreement actually entitles the general partner to adopt exactly the opposite strategy, investing in restricted private equity. Specifically, the Agreement entitles the general partner to invest in securities as the 1933 Securities Act defines the term in § 2(1), which includes restricted securities. Indeed, RCI did not adopt the strategy outlined in Schedule B to the Agreement, opting for a private equity strategy instead.

This shift in strategy lies at the center of this dispute. RCI claims that the par-

---

1. Rutledge maintained advising agreements with many companies. Limiting himself to the general partner position of a single limited partnership would, therefore, cost Rutledge his already established, lucrative advising and investment business Moreover, Continental sought to take advantage of Rutledge's relationships with various companies and, thus, did not want to limit his activities outside of the limited partnership.

ties, during their discussions regarding the strategy shift, orally amended Section 23 so that Continental would temporarily forgo its withdrawal rights until the illiquid investments that RCI anticipated making could be harvested for maximum profit. RCI alleges that in reliance on discussions it had with Bollman and Parker regarding Continental's withdrawal rights, it caused JRP to make several private, as opposed to public, equity investments.

After three illiquid, private equity investments, Continental and RCI, in September 1993, amended the limited partnership Agreement. JRP's auditor, Deloitte & Touche, informed RCI that it had earned carried interest (i.e., percentage of partnership profits) due to quarterly increases in the value of JRP's passive investments in public equity.[2] RCI informed Deloitte & Touche that it and Continental had agreed to calculate carried interest on an annual rather than quarterly basis. Deloitte & Touche would not recognize the change absent an amendment to the Agreement. As a result, RCI and Continental amended the Agreement in September 1993. While the parties amended the accounting section of the Agreement, RCI and Continental did not amend the Agreement to reflect the alleged oral modification of the withdrawal provision.

Following this amendment to the Agreement, RCI continued to invest in private equity. It caused JRP to make six additional investments between 1993 and 1995. In November 1994, RCI caused JRP to invest $9.1 million in United Refrigerated Services ("URS"). Simultaneously, URS paid RCI $270,000 as a transaction fee, or a closing fee, which Rutledge earned for negotiating the transaction. URS paid RCI the $270,000 directly from the $9.1 million investment that JRP had just made

in URS. Additionally, URS agreed during negotiations to pay RCI an annual consulting fee of $100,000. The Investment Memorandum RCI sent to Continental does not disclose the fees URS paid RCI.

RCI also caused JRP to purchase shares of Ellis Communications, Inc. ("ECI"). ECI paid RCI $400,000. (Rutledge refers to this payment as an investment banking fee.) RCI did not disclose this payment in the Investment Memorandum given to Continental.

In March 1995, JRP invested $5 million in a company called Fluidrive. In return for this investment, RCI received sixty-one of the company's eighty-five voting shares, while JRP received just less than 47 percent of the non-voting shares. As part of the negotiation, Fluidrive agreed to pay RCI $150,000 per year as an advisory fee for 10 years. RCI did not disclose this fee to Continental in the Investment Memorandum.

Continental's financial condition began to deteriorate in 1994. Continental began selling assets and seeking an equity infusion. In October 1994, hoping to restore the company's financial health, Continental eliminated its dividend entirely, sold a substantial subsidiary, and announced a plan for Robert M. Bass and Chase Manhattan Corporation to infuse equity into the company.

Continental's weakened financial condition affected JRP's financial strategy. As part of its attempt to maintain its financial health, Continental began replacing risky asset classes with conservative investment grade fixed income securities. Pursuant to this new strategy, Continental liquidated $600 million in public equity holdings and sought to withdraw its capital from JRP. RCI informed Continental that approximately $10 million of capital in JRP had not been committed to investments. RCI had already invested the remaining

---

2. Continental had funded JRP at inception rather than upon capital calls Consequently, JRP maintained a pool of cash. JRP invested this cash in passive public equity until it needed it to fund strategic investments. In addition to increases in value of strategic investments, JRP earned some profit from its passive investments of its cash pool.

fund capital in illiquid assets, or had made commitments on behalf of JRP which had not yet closed. Continental instructed RCI to fulfill its outstanding commitments, and send Continental the $10 million in uncommitted cash.

The financial turmoil eventually affected the ownership and management structure of both Continental and CAM, Continental's investment subsidiary. Between December 1994 and May 1995 CNA Financial Corporation ("CNA") purchased all outstanding Continental stock. During that time, Parker retired from Continental, and CAM eliminated its equity department, dismissing all employees in that department including Bollman. Under the stewardship of CNA, Continental sought to divest itself of most of its private equity investments, including investments in JRP.

Upon receiving notice of Continental's intention to withdraw, RCI and Continental prepared to value JRP's assets for distribution. The parties agreed to use Houlihan Lokey Howard & Zukin ("Houlihan Lokey") as an appraiser. RCI's Jerry St. Dennis sent a memorandum to Houlihan Lokey dated September 25, 1995 stating, "[o]ur current reading of the fund's partnership agreement is that we must make a distribution [to Continental] by the end of November and the valuation date is September 30." At his deposition, St. Dennis rejected this statement, claiming that he perpetuated a deliberate falsehood designed to cause Houlihan Lokey to think that a deadline existed for the preparation of the asset valuations.

In another letter, three months after the official Continental withdrawal letter, St. Dennis informed Continental that RCI might challenge Continental's right to withdraw from JRP. In essence, St. Dennis informed Continental that JRP's shift from a public equity investment strategy to a private equity investment strategy may be tantamount to an amendment to their Agreement. The written terms of the Agreement permitted the limited partner to withdraw from the partnership and to be paid its capital account.

The parties, however, could not agree on a method to value JRP's assets in order to accomplish JRP's winding up. Following dissolution, the Agreement instructs the general partner to distribute JRP's assets according to the relative size of each partner's capital account on the date of dissolution. The Agreement defines the size of each partner's capital account in the following manner: RCI receives 25 percent of JRP's profit off the top, and the remaining 75 percent is distributed into Continental's and RCI's respective capital accounts according to their partnership percentages. As a result, the manner in which JRP values its assets affects the size of the post-dissolution distribution each partner receives.

Continental suggested that Houlihan, Lokey value the assets according to Generally Accepted Accounting Principles ("GAAP"). In addition, Continental suggested that the assets be distributed in-kind to avoid any emergency liquidation of largely illiquid investments. St. Dennis, however, became concerned with discount factors used in GAAP determinations and proposed a different valuation methodology. RCI moved forward with JRP's asset valuations using its own methodology, as the Agreement entitles the general partner to determine in good faith the value of restricted securities.[3]

On April 11, 1996, RCI sent Continental JRP's year-end financial statements for 1995. JRP's auditors noted that the valuation method RCI used did not comply with GAAP. In July 1995, RCI reported the value of JRP's assets at $65.6 million. In

---

**3.** Section 11(e) of the Agreement provides: "Any security, the transferability of which is restricted, or the quantity of which, if sold, would materially affect the price of or market for the security, or the market for which is uncertain, and all other investments of the Partnership, shall be assigned the value that General Partner in good faith determines best to reflect its fair market value."

the year-end financial statements, RCI reported the value of JRP's assets at $112.1 million. Continental claims that RCI improperly inflated the valuations in order to increase its carried interest and receive a larger distribution following JRP's dissolution.

After counsel for Continental and counsel for RCI traded letters, RCI directed a third-party, Houlihan Lokey, to perform its own valuation of JRP's assets. Houlihan Lokey's valuation returned the same numbers as RCI's earlier valuation, about $112 million. Continental, however, claims that RCI directed Houlihan Lokey to use the same valuation RCI used to perform its valuation, which did not comply with GAAP or with Houlihan Lokey's own typical practices. Continental further claims RCI did not disclose that it gave Houlihan Lokey this directive when it asked Houlihan Lokey to value JRP's assets.

RCI distributed limited partnership assets to Continental on October 10, 1996 according to the percentages derived from Houlihan Lokey's valuation. It continues to manage JRP as an ongoing entity distributing, rather than reinvesting, profits gained from harvesting JRP's successful investments. Distributions after October 10, 1996 have complied with Houlihan Lokey's valuation.

## II. CONTENTIONS OF THE PARTIES

First, Continental asks the Court to find that it properly withdrew from JRP according to the terms of the Agreement. Furthermore, it asks the Court to cause RCI to properly value JRP's assets according to the terms of the Agreement and make appropriate distributions, whether those distributions are liquidation shares or distributions in kind. Second, Continental claims that RCI has improperly received fees from portfolio companies in breach of its duty of loyalty. It asks this Court to award Continental compensatory damages sustained by it as a result of RCI's fiduciary breach.

RCI claims that it and Continental orally amended Section 23 of the Agreement to suspend temporarily Continental's withdrawal rights until JRP's private equity investments could be properly liquidated. RCI further claims that Section 18 of the Agreement authorizes it to negotiate and receive fees from portfolio companies, which contractually immunizes it from any finding that it breached fiduciary duties owed to Continental.

## III. LEGAL ANALYSIS

### A. Standard of Review for Summary Judgment

■■■■ The Court appropriately grants summary judgment only where the moving party demonstrates the absence of genuine issues of material fact and that it is entitled to judgment as a matter of law.[4] On any application for summary judgment, the Court must view all the evidence in the light most favorable to the non-moving party.[5] The fact that the parties have filed cross motions for summary judgment does not alter that standard.[6] The Court also recognizes that the parties do not concede an absence of factual disputes simply because they have filed cross-motions for summary judgment.[7] Although the current dispute before the Court presents a case ripe for a decision on summary judgment because it arises from the application of a written limited partnership agreement,[8] the Court also maintains the discre-

4. Ch. Ct. R. 56(c); *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1142 (1990).

5. *Brown v. Ocean Drilling & Exploration Co.*, Del.Supr., 403 A.2d 1114, 1115 (1979).

6. *Bethany Village Owners Ass'n, Inc. v. Fontana*, Del. Ch., C.A. No. 1706–S, mem. op. at 5–6, 1997 WL 695570 at 16–19, Steele, V.C. (1997).

7. *See United Vanguard Fund v. Takecare, Inc.*, Del.Supr., 693 A.2d 1076, 1079 (1997).

8. *See Theater Acquisitions, L.P. v. Reading Co.*, Del. Ch., C.A. No. 15742, slip op. at 5, Chandler, C. (April 23, 1998).

tion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application.[9] With this standard in mind, I turn to the two primary issues in dispute.

### B. Continental Withdrew From JRP as of September 30, 1995

As a preliminary matter, the Court notes that while RCI now challenges Continental's right to withdraw from JRP, it has made capital account distributions to Continental *as if it had withdrawn ever since 1995*. Moreover, the Court notes the *timing* of RCI's challenge to Continental's withdrawal rights. RCI did not vigorously assert that the parties entered into an oral amendment to the Agreement until *after* Continental refused to agree to an inflated valuation, not compliant with GAAP. These undisputed facts color RCI's claims.

 The parties have asked this Court to decide whether Continental maintains the authority under the Agreement to withdraw from the entity and compel a dissolution and winding up of the limited partnership, or whether the parties entered into an oral modification of the Agreement, which suspends Continental's right to withdraw from the limited partnership. It is important to note that Delaware courts on many occasions have upheld the privately negotiated terms of final integrated writings. For example, it remains a sound and widely established precept that courts will not look behind the terms and provisions of a clear and unambiguous contract.[10] We have also held that Delaware courts should give the terms of contracts their plain meaning.[11] This preference rings particularly true in a limited partnership context where "[i]t is the policy of [the Delaware Revised Uniform Limited Partnership Act] to give maximum

effect to the principle of freedom of contract and to the enforceability of partnership agreements."[12]

The dispute before the Court arises from Section 23(c) of the Agreement and the alleged oral modification of this section. The clause at issue explicitly states that "a Limited Partner may voluntarily withdraw from the Partnership upon the giving of written notice of withdrawal to the Partnership (i) at least thirty (30) days prior to the end of any Cycle. . . ." According to these terms, Continental had every right to withdraw from the limited partnership. Consequently, absent an oral modification, the plaintiffs prevail in this litigation and the Court will find that they properly withdrew from the limited partnership.

This issue, therefore, hinges on three questions. Does the limited partnership agreement permit oral modifications? If so, have the defendants presented sufficient evidence to prove an oral modification occurred? And if so, have the defendants proven all the elements of a contract modification?

### 1. The Agreement Calls For a Written Amendment

 In its effort to resolve contract disputes, the Court looks first to the contract itself. In some cases, a contract provision, to which the parties previously and privately agreed, anticipates the area of discontent and provides a resolution to the conflict. Where contract language speaks to a particular dispute, this Court gives those privately negotiated and agreed upon terms their full and plain meaning.[13]

 The Agreement does, in fact, speak to modifications. It requires the parties to

---

**9.** *See Alexander Indus., Inc. v. Hill,* Del.Supr., 211 A.2d 917, 918–19 (1965).

**10.** *Gertrude L.Q. v. Stephen P.Q.,* Del.Supr., 466 A.2d 1213, 1217 (1983).

**11.** *Hallowell v. State Farm Mut. Auto. Ins. Co.,* Del.Supr., 443 A.2d 925, 926 (1982).

**12.** 6 Del. C. § 17–1101(c).

**13.** *Hallowell,* 443 A.2d at 926.

amend its terms in writing. Two sections of the governing document manifest the parties' intentions. Section 28 reads that "this Agreement may be amended, in whole or in part, by the *written* consent of Partners holding not less than one hundred percent (100%) of the outstanding interests in the Partnership" (emphasis added). Section 32 reads that "any and all consents, agreements or approvals provided for or permitted by the Agreement shall be *in writing* and signed copies of them shall be filed and kept with the books of the Partnership" (emphasis added). The defendants have not come forward with any writings under either of these sections. Accordingly, this Court will not recognize the unwritten alleged amendment to the Agreement.

█ The defendants disagree that the Agreement necessarily calls for a writing in order to amend the Agreement. The second sentence of Section 28 provides that "any provision of this Agreement ... may be amended by the General Partner in any manner that does not, in the sole discretion of the General Partner, adversely affect any Limited Partner." These terms seem to authorize RCI to unilaterally amend the Agreement, rendering a writing unnecessary. In order for RCI to unilaterally amend the Agreement, however, such an amendment cannot adversely affect any limited partner. Although RCI has discretion under the Agreement to determine whether amendments adversely affect the limited partner, RCI could not in good faith claim that the amendment it seeks to uphold does not adversely affect Continental. Suspending the limited partners' power to withdraw from the limited partnership does adversely affect the limited partners.

Indeed, RCI has not formally asserted that it unilaterally amended the Agreement. Instead, RCI contends that the parties' prior course of dealing effectively waives any writing requirement. RCI claims that the discretion Section 28 pro-

vides RCI to unilaterally amend the Agreement demonstrates that the parties had good reason to forgo writings. RCI's authority under Section 28 rendered writings superfluous because RCI, in reliance on Section 28, could simply amend any agreements reached, whether or not those agreements were written. Consequently, RCI and Continental opted for discussions rather than writings. Moreover, RCI claims that due to the close working relationship among Rutledge, Bollman, and Parker, the parties preferred to confront issues that arose by discussing them amongst themselves. Accordingly, RCI contends, the parties made it their practice not to reduce modifications to writing and, as a result, their prior course of conduct effectively waives any writing requirement.

█ The defendants are correct that it is settled law that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision.[14] The parties prior course of conduct, however, demonstrates that they did, in fact, on a prior occasion reduce a modification to writing. In September 1993, a date after which RCI claims the parties entered into the oral modification, the general partner and limited partners altered the accounting sections of their agreement, and at such time could have modified the Agreement's withdrawal provision to reflect the alleged oral modification. The parties left the section outlining a limited partner's fight to withdraw untouched.

█ Therefore, while the evidence demonstrates a close working relationship among Rutledge, Parker and Bollman, the parties' prior course of dealing demonstrates that they did, in fact, amend the Agreement in writing. The Court cannot deem the demand for written modifications waived.

**14.** *Pepsi–Cola Bottling Co. of Asbury Park v.* *Pepsico, Inc.,* Del Supr., 297 A.2d 28 (1972).

### 2. RCI Has Not Met Its Evidentiary Burden to Prove an Oral Modification

▮▮▮▮▮ Even assuming RCI could unilaterally amend the Agreement by invoking Section 28, the Court still would not uphold the alleged oral modification. Delaware law's aversion to oral modifications of written agreements further saps any strength from defendants' argument. A party asserting an oral modification must prove the intended change with "specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document." [15] Absent a written modification, the Court finds itself in a precarious position. In order to recognize the oral modification, the Court must take defendants at their word, despite plaintiffs' denial of any alteration. To make such a leap of faith, however, the Court must first rule out the possibility that the asserting party has alleged an oral modification in an attempt to unilaterally alter a pre-existing, but unfavorable, agreement. In an effort to screen out parties' attempts to single-handedly change contracts under the guise of oral modifications, courts have established a high evidentiary burden for parties asserting such changes. Delaware law certainly continues to recognize the viability of oral modifications of contracts, but these alterations must be proven with "specificity and directness."

The defendants argue, however, that they need not meet the evidentiary burden Reeder establishes. Instead, RCI relies on Haft v. Dart Group Corp.,[16] which holds that a court must find an agreement legally binding where its terms are so reasonably definite and certain that they "provide a basis for determining the existence of a breach." The defendants claim that the alleged amendment, which temporarily forgoes Continental's right to withdraw from JRP, is certain enough for the Court to

determine whether a breach exists. Therefore, as the argument goes, when Continental withdraws, the Court can easily determine that such a withdrawal breaches the amendment to the Agreement because the amendment restricts Continental's right to attempt that very withdrawal. Consequently, the Court should uphold the oral modification using Haft because the modification is reasonably definite and certain, so as to provide a basis for determining a breach.

▮▮▮▮ RCI misplaces its reliance on Haft. The Court, in Haft, addresses whether terms in an agreement are definite and certain enough to be binding, or are so ambiguous that the Court cannot assign the terms a cohesive meaning. Where terms in an agreement are so vague that a Court cannot determine the existence of a breach, then the parties have not reached a meeting of the minds, and a Court should deny the existence of the alleged agreement.[17] Here, the parties do not argue over the certainty or ambiguity of terms. Both RCI and Continental agree on what the alleged oral modification would say. The parties in this case argue over the very existence of the oral modification of the Agreement, not the certainty or ambiguity of its terms. Consequently, Haft is inapposite and RCI must meet the evidentiary threshold established in Reeder in order to satisfy this Court that the parties actually entered into an oral modification of the written Agreement. Thus, RCI must present specific and direct evidence.

The defendants rely heavily on the limited partnership's shift in investment strategy from public equity investments to private equity investments to prove the legally binding modification. In their brief and again at oral argument, the defendants explain that the original contract's withdrawal provisions reflect an agree-

---

**15.** *Reeder v. Sanford School, Inc.,* Del.Supr., 397 A.2d 139, 141 (1979).

**16.** 877 F.Supp. 896, 906 (D.Del.1995).

**17.** *Haft,* 877 F.Supp. at 906.

ment that partners typically use to define rights in a limited partnership which invests in public equity. Defendants contend that partners in public equity funds typically maintain the ability to withdraw at will because the existence of public markets provides the general partner the ability to quickly value and sell assets in order to give the withdrawing partner its capital account plus appropriate partnership profit. Both the defendants and plaintiffs, however, agreed to shift from public equity investments to private equity investments and, according to RCI, orally modified the withdrawal provision at that time to reflect the new investment strategy. Private equity investments, unlike public equity investments, remain largely illiquid, rendering at will withdrawal impractical. Moreover, RCI maintains that private equity investments only produce substantial returns over extended periods of time and therefore require the long term commitment of the limited partners. The defendants further claim that they would never have caused the limited partnership to invest in private equity if the limited partners had not assured them of their long term commitment.

 The defendants rely on the affidavits of Charles Parker and Gerald Bollman to demonstrate that RCI and Continental reached a legally binding agreement limiting the parties' right to withdraw from the limited partnership once it began investing in private equity. Bollman, in his affidavit, testifies that he explicitly told RCI that he supported the shift to private equity investment. Bollman's affidavit also specifically states that he explicitly told RCI to seek other similar investments. When the affidavit discusses withdrawal rights, however, Bollman's statements become quite vague. He does not say that he informed RCI that Continental would not withdraw. Instead, he says, based on his conversations with Rutledge, he merely understood that he was committing Continental to remain a limited partner until RCI could appropriately liquidate the private equity investments. This testimony only indicates Bollman's silent understanding, not facts indicating that he and RCI reached an oral agreement. Bollman's affidavit does not reveal facts constituting forbearance of Continental's legal rights under the agreement, nor any desire to do so. There is a difference between wanting to preserve the limited partnership in order to realize greater profit while still maintaining the legal right to withdraw, and relinquishing the legal right to withdraw altogether. Moreover, the only written correspondence between RCI and Bollman regarding the shift to private equity investments, a December 26, 1991 letter, contains no reference whatsoever to the alleged modifications, despite the fact that RCI's legal counsel drafted the letter.

The Court finds Parker's affidavit, upon which the defendants also rely, similarly vague. Parker says in his affidavit that he told RCI he would not put RCI in a position where RCI would have to prematurely liquidate private investments. Again, this testimony does not demonstrate unambiguous and specific discussion of a modification of the limited partnership agreement. Neither Parker nor Bollman ever specifically refers to their right to withdraw in the sections of their affidavits referenced by defendants' brief, or directly state that they told RCI that Continental relinquished its withdrawal rights under the contract.

In addition to their affidavits, Parker's and Bollman's depositions cast extreme doubt on the existence of a binding oral modification. During their depositions, plaintiffs' counsel, quite directly, asked Parker and Bollman the following question: "Did at any time the limited partners ever relinquish their right to withdraw [as] partners?" Parker answered "not to my knowledge." Bollman answered simply "no." If Parker and Bollman had eschewed Continental's right to withdraw from the limited partnership in any way, then plaintiffs' counsel's question would

have compelled Parker and Bollman to answer differently.

Despite the defendants' reasonable argument, the facts they allege do not rise to the level of "specificity and directness" required for the Court to enforce the alleged oral amendment. The facts defendants allege only confirm that the parties anticipated maintaining the investments until profitable harvesting points, but do not establish that the parties agreed upon an alteration of their withdrawal rights. Parker's deposition indicates that this is a proper reading of the facts. Counsel asked Parker if, by agreeing to private equity investments, he was "making a commitment not to pull out of that particular investment prior to the time it reached maturity in the ordinary course?" Parker did not answer yes. Instead he said that "[a]ll of the investments were made with [the] *expectation* that it would be held without impairment to maturity . . . ." (Emphasis added.)

 The Court notes that if it read the facts differently, the affidavits might contradict the depositions. To the extent the affidavits contradict the depositions, this Court will exclude the offending affidavit testimony. A party cannot raise a genuine issue of material fact by submitting affidavits that directly contradict his earlier testimony.[18] In such a case, the defense certainly cannot demonstrate that it meets the standard required for an oral modification because Delaware law mandates that this Court strike the conflicting

affidavit testimony.[19] Thus, even though the Court examines the facts in a light most favorable to the defendants, this Court still cannot enforce the alleged oral modification.

### 3. The Contract Modification RCI Alleges Lacks Consideration

 Assuming arguendo the defense alleged sufficiently specific facts to maintain the oral modification, the Court would still grant summary judgment for the plaintiffs on this issue because the supposed verbal alteration lacked the necessary consideration to be binding. Any amendment to a contract, whether written or oral, relies on the presence of mutual assent and consideration.[20] Despite the Court's skepticism as to the mutual assent element, the oral modification clearly fails for lack of consideration. Delaware courts define consideration as a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request.[21] Past consideration, as opposed to true consideration, however, cannot form the basis for a binding contract. A party cannot rely on a pre-existing duty as his legal detriment in an attempt to formulate a contract.[22] Here, the defendants clearly rely on past consideration, which renders the alleged oral modification unenforceable.[23]

 The defendants allege the existence of three forms of consideration to support the alleged oral modification. One, the defendants claim they suffered a

**18.** *Technicorp Int'l II, Inc. v. Johnston,* Del. Ch., C.A. No. 15084, mem. op. at 41, 43–4, Jacobs, V.C. (August 22, 1997).

**19.** *Id.*

**20.** *DeCecchis v. Evers,* Del.Supr., 174 A.2d 463 (1961).

**21.** *13 North Enterprises, Inc. v. Bruner,* Del. Ch., C.A. No. 1179 mem. op. at 2, 1992 WL 187630 at 1–2, Chandler, V.C. (July 8, 1992).

**22.** *McAllister v. Kallop,* Del. Ch., C.A. No. 12856, mem. op. at 14, 1995 WL 462210 at 13–14, Chandler, V.C. (July 28, 1995).

**23.** I note that RCI did not offer to forgo its own withdrawal rights in exchange for the plaintiff's promise to do the same. I remain unsurprised. RCI could not have withdrawn from the limited partnership if, as it claims, it wanted to maintain long-term investments because its withdrawal would have forced an immediate dissolution and winding up of the partnership. *See* the Agreement, § 23(a). Thus, RCI attempts to rely on other forms of consideration.

detriment because they had to carry the private equity investments at cost on the accounting books, and therefore would receive less "carried interest," or percentage of fund profit, than if they had carried the investments at their true market value. The defendants, however, agreed to carry private equity investments at cost when they first entered into the Agreement. This obligation thus constitutes a preexisting duty upon which the defendants cannot rely as consideration for the alleged modification.

Two, they claim that the limited partners received a benefit, constituting consideration, from RCI's "efforts to maximize long-term investment returns" and Rutledge's contacts in the financial world. But RCI, as general partner and investment strategist, had this obligation to the limited partners long before the alleged modification and before its switch to a private equity strategy. Thus, here too RCI relies on a preexisting duty.

Three, defendants claim that RCI incurred greater expenses as a result of the shift to a private equity strategy, which serves as sufficient consideration for the modification. But the defendants did not incur these expenses in exchange for a modification of the withdrawal rights under the contract. RCI incurred additional expense as a result of *its choice to change investment strategies*, not as an inducement for Continental's promise to amend the agreement. The defendants have failed to establish the consideration re-

quired for the Court to find a binding amendment. Therefore, even assuming the defendants met the standard for enforcement of an oral modification, the Court would not have found the alteration binding for lack of consideration.

### 4. The Court Will Not Invoke Promissory Estoppel as a Substitute for Consideration

 The Court also will not entertain defendants' invitation to invoke promissory estoppel as a substitute for consideration. Defendants cannot prevail under this theory. To succeed on a claim for promissory estoppel, the promisee must prove that the promisor made a promise with the intent to induce action or forbearance, that promisee actually relied on the promise,[24] and that promisee suffered an injury as a result.[25] The asserting party must be able to prove these elements of promissory estoppel by clear and convincing evidence.[26] Moreover, the promise, in such a case, must be definite and certain.[27] Here, for the reasons previously discussed, Bollman and Parker did not specifically promise RCI to forbear Continental's withdrawal rights. The Court recognizes that Continental expected to hold its private equity investments to maturity. This Court cannot say with the necessary definiteness and certainty, however, that Continental promised to relinquish its withdrawal rights altogether. Ultimately, the Court rejects RCI's promissory estoppel claim because the statements Bollman or Parker made, if they made them at all, did

24. The plaintiff's brief suggests that a necessary element of promissory estoppel is "reasonable" reliance, not simply reliance. Although it cites no Delaware cases, the brief refers to a number of federal jurisdictions, including the District of Delaware, which embrace "reasonable" reliance as an element of promissory estoppel. The Court need not confront whether imputing a reasonableness requirement into the reliance element is appropriate under Delaware law because the defendants have failed to prove by clear and convincing evidence other necessary elements. The Court agrees, however, that reliance on an oral promise that directly contra-

dicts a written contract, at a minimum, stretches the definition of reasonable.

25. *VonFeldt v. Stifel Financial Corp.*, Del. Supr., 714 A.2d 79, 87 (1998).

26. *Reeder*, 397 A.2d at 139.

27. *State v. Simpson*, Del. Ch., C.A. No. 899, 1990 WL 143837, let. op. at 7, Hartnett, V.C. (Sept. 24, 1990)("An essential element of promissory estoppel is that the promisor's representation must be reasonably definite and certain so that the intentions of the parties can be ascertained.")

not amount to a promise on which RCI could rely.

### 5. The Court Will Not Invoke the Covenant of Good Faith and Fair Dealing

 I also reject defendants claim that the plaintiffs' withdrawal violates the covenant of good faith and fair dealing. The implied covenant of good faith "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract."[28] This doctrine emphasizes "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."[29] The parties' reasonable expectations at the time of contract formation determine the reasonableness of the challenged conduct.[30] I note that cases invoking the implied covenant of good faith and fair dealing should be rare and fact-intensive. Only where issues of compelling fairness arise will this Court embrace good faith and fair dealing and imply terms in an agreement.[31]

 RCI claims that Continental's withdrawal violates the implied covenant of good faith and fair dealing because it deprives RCI its ability to maximize the partnership profit. RCI's argument contains two weaknesses. First, the parties' reasonable expectations at the time of contract formation indicate that both parties recognized the possibility of private equity investments, but agreed to the withdrawal provisions in Section 23 anyway. Indeed, the defendants in their own brief in support of summary judgment write that "the Agreement expressly contemplates investments by the Partnership in securities"

which are subject to transfer restrictions. The Agreement confers on RCI discretion to value in good faith securities 'the transferability of which is [sic] restricted.'" Although the parties expected to invest largely in public equity, they did negotiate terms which authorized private equity investment. In that light, Continental cannot act in bad faith if, at the time of contract formation, the parties expected that the partnership may at some point invest in private equity, and they agreed to the withdrawal provisions in the Agreement.

Second, the defendants misapprehend the law when they claim that the plaintiffs' subjective motivation is irrelevant. Violating the implied covenant of good faith and fair dealing implicitly indicates bad faith conduct. The Delaware Supreme Court has explicitly held that a claimant must demonstrate that the conduct at issue involved fraud, deceit, or misrepresentation in order to prove a breach of the implied covenant.[32] Yet, despite their conclusory claim that the plaintiffs wanted to deny RCI its ability to maximize partnership profit, the defendants have not alleged facts or pointed to evidence revealing bad faith. The plaintiffs, on the other hand, have alleged plausible and reasonable explanations for Continental's withdrawal. The plaintiffs claim that the new Continental owners opposed private equity investments at the time, and, after interviewing RCI, doubted its level of sophistication in the private equity market. Continental's conduct does not strike me as unfair or in bad faith.

### 6. Damages

 The limited partners withdrawal dissolves the limited partnership as of Sep-

**28.** *Wilgus v. Salt Pond Investment Co.*, Del. Ch., 498 A.2d 151, 159 (1985).

**29.** *E.I. DuPont de Nemours & Co. v. Pressman*, Del.Supr., 679 A.2d 436, 443 (1996).

**30.** *See Schwartzberg v. CRITEF Assocs. L.P.*, Del. Ch., 685 A.2d 365, 376 (1996).

**31.** *Cincinnati SMSA L.P. v. Cincinnati Bell Cellular Systems Co.*, Del.Supr., 708 A.2d 989 (1998).

**32.** *Merrill v. Crothall–American, Inc.*, Del. Supr., 606 A.2d 96, 101 (1992).

tember 30, 1995. Delaware law dissolves the limited partnership as a matter of law after all limited partners have withdrawn.[33]

■ Section 24 of the Agreement governs the general partner's responsibilities for winding up the limited partnership upon dissolution. The relevant section states:

On dissolution of the Partnership, the General Partner ... will wind up the Partnership's affairs and will distribute the Partnership's assets in the following manner and order: (a) in satisfaction of the claims of all creditors of the Partnership; and (b) any balance to the Partners in the relative proportions that their respective Capital accounts bear to each other, those Capital Accounts to be determined as of the Year ended on the date of the dissolution.

Pursuant to this section of the agreement, RCI must wind up the limited partnership, and make all future winding up distributions based upon the ratio of the partners' respective capital accounts as of the date of dissolution, September 30, 1995.

It seems that RCI has made winding up payments to the limited partners every year after 1995. Continental, however, challenges the method RCI used to value the limited partnership's assets in order to make winding up distributions. Continental claims that RCI's valuation method improperly inflates JRP's assets and results in too high a pay-out to RCI. In order to resolve this dispute, the Court will conduct a trial to determine the limited question of which valuation method is appropriate to determine the value of JRP's assets. The Court will also hear the parties' arguments with respect to what they consider the most appropriate method to distribute JRP's assets (whether as liquidated shares, as in-kind distributions, or by some other method).

### C. Section 18 and RCI's Fiduciary Duty of Loyalty

The second issue before the Court is whether RCI properly received fees directly from portfolio companies in addition to the management fee the limited partnership paid RCI. Continental pejoratively labels the fees paid directly to RCI "kickbacks," which portfolio companies gave to RCI in return for RCI causing the limited partnership to invest capital in the portfolio company. These kickbacks, Continental argues, evidence a breach of RCI's duty of loyalty to the limited partners. RCI, on the other hand, contends that it received fees from portfolio companies as compensation for various services rendered to those companies, and not as kickbacks for investing limited partnership capital. The parties to the Agreement contracted around the duty of loyalty in this regard, RCI claims and, therefore, its receipt of fees from portfolio companies remains perfectly legitimate under the terms of the Agreement.

■ This dispute highlights a defining tension between contract principles and fiduciary duties. In the limited partnership context, Delaware law resolves this conflict in favor of contract law, rendering fiduciary duties default rules. Consequently, parties to a limited partnership can enter into a contract which diminishes the general partner's fiduciary duties.[34] In order to absolve the general partner from his duties of loyalty or care, the general partner and limited partners must make their intentions plain.[35] Typically, parties place an explicit clause in the limited partnership agreement to that effect.[36] Where a contract clause amends the fiduciary duties a general partner owes the limited partners, a court will give full force to the terms of the contract.[37]

---

**33.** 6 Del. C. § 17–801(4).

**34.** *Sonet v. Timber Co., L.P.,* Del. Ch., 722 A.2d 319 (1998).

**35.** *Id.*

**36.** *See Kahn v. Icahn,* Del. Ch., C.A. 15916, mem. op. at 5–7, Chandler, C., (Nov. 12, 1998).

The parties' dispute centers on section 18 of the Agreement. Section 18 provides that:

Each Partner agrees that the General Partner ... may engage in other business activities or possess interests in other business activities of every kind and description, independently or with others. These activities may include, without limitation, investing in, financing, acquiring and disposing of any interest in securities or other instruments in which the Partnership may from time to time invest, or in which the Partnership is able to invest or otherwise have any interest. The Limited Partners agree that the General Partner may act as general partner of other partnerships, including investment partnerships and need not contribute any compensation or other income for such activity to the Partnership.

Both the defendants and plaintiffs agree that section 18 modifies the general partner's duty of loyalty to the limited partners. They disagree, however, about the scope of section 18 and whether it permits RCI's actions in this particular case.

This conflict implicates two questions. First, the Court must determine the scope of section 18. Exactly what type of behavior does section 18 permit that the fiduciary duty of loyalty would normally prohibit? Second, the Court must determine whether RCI's actions, which Continental now challenges, constitute the type of behavior Section 18 authorizes. In other words, once the Court determines the scope of section 18, it must decide whether RCI's actions fall within that scope.

### 1. Section 18 Entitles RCI[7] to Take Partnership Opportunities, But Not to Self–Deal

█ The first part of this analysis requires the Court to interpret a contract provision to determine to what degree Section 18 diminishes the general partner's duty of loyalty. The law mandates the court distill and enforce the reasonable, shared expectations of the parties at the time they contracted.[38] To do so, the Court applies principles of contract construction that courts have traditionally employed in construing written contracts. Courts refer to the primary rule of construction as the clear meaning rule.[39] Where the parties have created an unambiguous integrated written statement of their agreement, the clear meaning rule instructs courts to enforce the plain meaning of contractual language as understood by a hypothetical third party.[40] Here, the Court must assess whether the contract language unequivocally establishes the parties' reasonable expectations.

█ The Court need not look beyond the express contractual language to determine the scope of section 18. According to its terms, Section 18 permits RCI to seek other business ventures, usually prohibited by the partnership opportunity doctrine,[41] but leaves the duty of loyalty's prohibition

**37.** Many opt for the limited partnership form in Delaware precisely in order to embrace this flexibility. *Kahn* at 6; DRLPA 17–1101(d). Commentators considering the subject agree that limited partnerships' contract theory based structure provide incentives for parties to opt for the limited partnership over other forms of business organizations. *Sonet* at 322 n. 8. As such, parties, otherwise unwilling to shoulder fiduciary burdens, maintain the opportunity to form limited partnerships precisely because the parties can contract around some or all of the fiduciary duties the general partner typically owes the limited partners.

**38.** *U.S. West, Inc. v. Time Warner Inc.*, C.A. No. 14555, mem. op. at 9, 1996 WL 307445 at 23–27, Allen, C. (June 6, 1996).

**39.** *Id.*

**40.** *Id.*

**41.** The partnership opportunity doctrine is the equivalent of the corporate opportunity doctrine.

on self-interested transactions intact. Section 18 explicitly states that RCI "may engage in other business activities ... of every kind and description ...." This language provides a broad authorization for RCI to engage in other business ventures. Thus, RCI is quite right when it argues that section 18 authorizes RCI, as general partner, to engage in business activities involving portfolio companies in addition to its role as general partner of the limited partnership. Such activities may involve any advisory or investment banking business in which RCI engages, including activities in which RCI maintains portfolio companies as clients. Moreover, according to the language of section 18, RCI may serve on portfolio companies' boards of directors.

The facts bolster the clear meaning the Court assigns Section 18. Rutledge is an economist who has worked with both the President Ford and Reagan administrations, and has served as an advisor to more than 100 companies. He is a professional economic advisor. Thus, his success depends on advising many companies. He would not have accepted a position as general partner if the terms of the position would have completely limited his other lucrative business opportunities. The Court finds it perfectly logical that the parties included Section 18 in the Agreement. Continental, which covets Rutledge's participation, agreed to the clause in order to secure Rutledge's acceptance of the general partner position. The resulting section entitles Rutledge to pursue other investments and business opportunities while occupying the general partner position at JRP.

Section 18, however, does not permit RCI to engage in transactions involving self-dealing in which RCI stands on both sides of a transaction. Section 18 includes the terms "other business activities." This language indicates that the parties intended to diminish the general partner's duty of loyalty where it is implicated by "other" business activities, or activities *outside* the limited partnership. Section 18, on the other hand, does not address situations where the general partner's actions *within* the limited partnership implicate the duty of loyalty—where the general partner engages in self-dealing. No contractual language eschews the general partner's duty to the limited partner to refrain from entering into self-dealing transactions. Therefore, absent authorizing contractual language, the general partner cannot self-deal—it cannot use its position as general partner, and its ability to control the terms of transactions, to invest limited partnership funds for its own gain, as opposed to investing for the benefit of the limited partnership.

 Continental claims that RCI has, in fact, engaged in this type of self-dealing. Specifically, Continental contends that portfolio companies paid fees to RCI as an inducement for it to invest limited partnership funds, as opposed to if portfolio companies paid those fees as compensation for services provided outside of the limited partnership. Accordingly, Continental claims that RCI's actions implicate the fiduciary duty of loyalty that a general partner owes a limited partner.[42] Indeed, as a primary part of the fiduciary duties a general partner owes the limited partners, a general partner must account to the partnership for any profits he derives, without the limited partners' consent, while performing the business of the partnership or using its property.[43] If RCI has engaged in self-dealing, the law will not allow a fiduciary to "profit personally from his [disloyal] conduct."[44] Even

**42.** *Boxer v. Husky Oil Co.*, Del. Ch., 429 A.2d 995, 997 (1981); *In re Boston Celtics Limited Partnership Shareholders Litigation*, Del. Ch., C.A. No. 16511, mem. op., 1999 WL 641902, Steele, V.C., (Aug. 6, 1999).

**43.** *Boxer*, 429 A.2d at 997.

**44.** *See Thorpe v. CERBCO, Inc.*, Del.Supr., 676 A.2d 436, 445 (1996).

if the investments which RCI negotiated on behalf of the limited partnership prove profitable for the limited partners, RCI's allegedly disloyal acts entitle the limited partners to recover from RCI improper fees portfolio companies may have paid RCI in its role as general partner. Delaware law does not allow a disloyal fiduciary to profit from his breach.[45]

### 2. The Court Must Make a Factual Determination About Whether Section 18 Protects RCI's Specific Actions In This Case

■ Now, the Court turns to the second part of its analysis—did RCI's actions fall within the scope of section 18? RCI claims the portfolio companies paid it fees for advisory services, and these advisory services clearly represent the type of activity the parties intended to ordain when they entered into the Agreement. These services qualify as "other business activities of every kind and description" within section 18. The services include, claims RCI, advisory services, investment banking services, and payment for sitting on the board of directors of a number of portfolio companies. Consequently, RCI claims that section 18 authorizes this behavior and, therefore RCI's actions cannot constitute a breach of the duty of loyalty that Continental alleges.

RCI, however, does not specifically describe the work it performed for portfolio companies that would constitute "other business activities" under Section 18. Instead, RCI makes nondescript, conclusory statements regarding its relationships with various portfolio companies. For example, it states that "[p]rior to the formation of the Partnership, Hawaiian Electric Industries ... had retained Rutledge as an advisor."[46] It further claims that "Rutledge

had a long standing advisory relationship with Stone Manufacturing Company."[47] Moreover, RCI claims that it "had a long-standing advisory relationship with American Standard, Inc."[48] Aside from these statements, RCI does not describe the substantive actions it took in its role as advisor to the portfolio companies. RCI also does not describe the amount of fees it received for the work it claims it performed for the portfolio companies. In order for the Court to consider RCI's services "other business activities," RCI must have performed such services in its role as advisor, and not simply have occupied an honorary position. Absent additional facts, the Court struggles to label RCI's receipt of fees as "other business activities" under Section 18.

Continental contends that although RCI claims it performed director, advisor, and investment banking services, RCI may not have actually performed such services. Instead, Continental suggests that RCI has merely labeled the fees it has received as advisory, investment banking, and directors fees, while actually accepting those fees in return for performing its function as general partner—causing limited partnership funds to be invested in private equity. Such activity—receiving extra fees for performing the functions expected of a general partner—involves self-dealing, which section 18 does not explicitly permit. Such self-dealing implicates RCI's duty of loyalty.

Continental has come forward with a number of specific facts bolstering its arguments. Continental argues that the timing of the fees evidences self-dealing because supposed advisory fee payments often coincided with investments of limited partnership capital. For example, Stone Manufacturing Co. ("SMC") gave RCI a

---

**45.** *Thorpe,* 676 A.2d at 445 (*citing Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 510 (1939)).

**46.** Memorandum of Law In Support of Defendants' Motion For Partial Summary Judgment ("Def.Br."), p. 13.

**47.** Def. Br., p. 16.

**48.** Def. Br., p. 18.

two-year-$1.1 million advisory deal, a $250,000 increase over RCI's former rate, just after RCI caused the limited partnership to loan SMC $4,250,000.

Moreover, a company called United Refrigerated Services paid RCI a $270,000 "transaction fee" just after the limited partnership invested $9,100,000. URS paid this $270,000 directly out of the $9,100,000 that the limited partnership had just invested in it. URS and RCI also entered into a consulting contract worth $100,000 annually immediately following the limited partnership's investment.

Ellis Communications, Inc. paid RCI $400,000 at the time RCI caused the limited partnership to invest money in ECI. Another company, named Medical Specialties Group ("MSG"), paid RCI $340,000 just after the deal negotiations. MSG also offered Rutledge an advisory contract and a seat on its board of directors during the negotiations for investment of limited partnership capital.

Another portfolio company, Fluidrive, paid RCI $400,000 just after JRP invested in the company. Moreover, RCI awarded itself 61 of the 85 voting shares of Fluidrive, while providing the limited partnership with 47 percent of the non-voting shares. Effectively, Continental claims, RCI used limited partnership funds to gain voting control of Fluidrive for itself. RCI, in its briefs and at argument, has not denied or contradicted the timing of these fees or the amounts received.

Despite the compelling and powerful facts Continental presents, material facts remain in dispute. I must ask the parties to develop facts at a trial in order to answer the following question: Exactly what actions did Rutledge take as an advisor, investment banker, or member of a board of directors, *in addition to merely negotiating investment of limited partnership capital,* that would constitute "other

business" under section 18 of the limited partnership agreement?

If the facts developed at trial satisfy the court that RCI did, in fact, perform *other services* in return for compensation, then Section 18 permits RCI to retain the fees earned from such "other business activities." But if the facts demonstrate that RCI received the fees for performing the business of the limited partnership, and has merely called the fees advisory, investment banking, or director fees, then RCI will have engaged in self-dealing which Section 18 does not permit. In this latter event, RCI will have implicated its duty of loyalty to Continental, and thus will have to disgorge the fees which portfolio companies improperly paid it. In Delaware, it remains a fundamental principal that a disloyal fiduciary may not profit from his breach.[49]

### 3. The Revised Uniform Limited Partnership Act § 17–1101(d)(1) Does Not Provide A Safe Harbor For Good Faith Reliance For RCI

 RCI insists that if the Court finds that Section 18 does not authorize RCI's receipt of fees, the Court should permit RCI to keep the fees despite Section 18. RCI invokes § 17–1101(d)(1) of the Revised Uniform Limited Partnership Act which bars a fiduciary duty claim against a general partner acting in good faith reliance on the limited partnership agreement. The requisite section of the RULPA reads:

> To the extent that … a partner … has duties (including fiduciary duties) and liabilities relating thereto to a limited partnership … (1) any such partner … acting under a partnership agreement shall not be liable to the limited partnership or to any such other partner for the partner's … good faith reliance on the provisions of such partnership agreement …

**49.** *Bomarko, Inc. v. International Telecharge, Inc.,* Del. Ch., C.A. No. 13052, mem. op. at 54, 1999 WL 1022083 at 22, Lamb, V.C. (November 4, 1999) (*citing Thorpe,* 676 A.2d at 445).

The RULPA's § 17–1101(d)(1) only applies, however, where the Court finds the clause upon which the defendants relied ambiguous.[50] If a partner can interpret reasonably a clause in the limited partnership agreement in more than one manner, and that general partner relies in good faith on the incorrect interpretation, then the Court will excuse the general partner's breach of the limited partnership agreement. But, if the limited partnership agreement remains unambiguous, then § 17–1101(d)(1) does not apply. A general partner cannot wrongly rely in good faith on a misinterpretation of a contract clause if it is subject to only one plausible interpretation.

Section 18 is unambiguous and, therefore, I reject the invitation to invoke § 17–1101(d)(1). As explained earlier, Section 18 permits RCI to embrace other business opportunities, but it does not authorize self-dealing. RCI cannot in good faith interpret Section 18 to enable it to appropriate limited partnership property for its own gain to the exclusion of the limited partners. Such an interpretation ignores the word "other" in the phrase "other business activities" in Section 18. Inclusion of the word "other" limits the scope of Section 18 to activities outside the limited partnership and exclusive of RCI's role as general partner.

### 4. The Acquiescence Defense

RCI also invokes the acquiescence defense. It claims that even if receipt of fees from portfolio companies breached the duty of loyalty it owed to Continental, the Court cannot find RCI liable because Continental acquiesced to such conduct.

Under this doctrine, one who has full knowledge of and accepts the benefits of a transaction may be denied equitable relief if he or she thereafter attacks the same transaction.[51] The success of this defense hinges on the challenging party's knowledge. If the plaintiffs knew of the questionable behavior and did not previously challenge it, while simultaneously accepting a benefit from the now challenged behavior, then a Court will find that the plaintiffs acquiesced to the wrongdoing and will bar a claim against the alleged wrongdoer.

RCI claims that Continental knew that portfolio companies had been paying fees to RCI, but did not challenge the behavior. Continental, RCI argues, sat idly by reaping the benefits of the investments that RCI caused the limited partnership to make, all the while allowing RCI to keep fees resulting from those transactions. As a result, so the argument goes, Continental acquiesced to RCI's receipt of fees from portfolio companies.

Continental, on the other hand, claims no knowledge whatsoever of RCI's receipt of fees. In order for the defense of acquiescence to apply, RCI must prove that Continental had knowledge that portfolio companies paid RCI fees for investing limited partnership money, but despite this knowledge never objected to the fees. RCI, however, has produced little evidence demonstrating that Continental knew the portfolio companies had been paying RCI. Instead, RCI again only makes conclusory statements such as "Continental had knowledge or notice that RCI and/or its personnel received fees from portfolio companies beginning with the first Partnership investment in HEI in summer 1991 and on numerous occasions thereafter." [52]

**50.** *United States Cellular Inves. v. Bell Atlantic Mobile Sys., Inc.,* Del. Ch., C.A. No. 12984, mem. op. at 5, 1994 WL 116207 at 2, Berger, V.C. (March 11, 1994), *aff'd,* Del.Supr., 677 A.2d 497 (1996).

**51.** *Iseman v. Liquid Air Corp.,* Del. Ch., C.A. No. 9694, slip op. at 4, 1993 WL 40048, Berger, V.C. (Feb. 11, 1993) (*citing Kahn v. Household Acquisition Corp.,* Del.Supr., 591 A.2d 166, 177 (1991)); *Papaioanu v. Commissioners of Rehoboth,* 186 A.2d 745, 749–50 (1962) (*quoting* Herman, Commentaries on the Law of Estoppel, at 1194).

RCI claims that, at the time the parties signed the limited partnership agreement, Bollman told Rutledge to keep all fees the portfolio companies paid to him because he believed that Rutledge's involvement in portfolio companies would be beneficial to the limited partnership. Bollman's affidavit does indicate that he approved RCI's receipt of fees for actual advisory services performed for the portfolio companies. Bollman's affidavit does not, however, demonstrate approval for any self-dealing in which RCI may have been engaged.

Moreover, even if Bollman had told RCI to keep all fees, such advanced approval does not indicate that Continental acquiesced to self-dealing. RCI can only raise acquiescence if Continental had knowledge of self-dealing, and then accepted a benefit from the self-dealing transaction. Bollman had not at that time accepted any benefit from any self-dealing transactions. Thus, acquiescence is inapplicable in these circumstances.

## IV. CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion for summary

52. Def. Br., p. 46.

judgment with regard to its withdrawal from the limited partnership. Counsel should schedule proceedings to resolve questions of damages or other relief in light of the Court granting plaintiffs' motion for summary judgment on this issue.

The Court denies both the plaintiffs' and defendants' motions for summary judgment with regard to RCI's retention of fees. As this decision indicates, the Court is familiar with the chronology of events and the disputed areas between the parties. The remaining issues of fact concern the actions RCI took in return for the fees the portfolio companies paid to it, an issue that should be quickly resolved, at trial if necessary. I direct counsel to confer and agree on possible dates to schedule this matter, as well as submit a form of order implementing this decision.