# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE MORROW PARK HOLDING LLC | ) | CONSOLIDATED |
| | ) | C.A. No. 2017-0036-PAF |

## MEMORANDUM OPINION

Date Submitted: April 2, 2020
Date Decided: June 22, 2020

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Marc L. Newman, Christopher D. Kaye, and Mahde Y. Abdallah, THE MILLER LAW FIRM, P.C., Rochester, Michigan; *Attorneys for Plaintiffs and Counterclaim Defendants Jonathan Holtzman, Village Green Residential Properties, L.L.C., and VGM Clearing, LLC, and Counterclaim Defendant City Club Apartments, LLC.*

Richard P. Rollo, Travis S. Hunter, Angela Lam, and John T. Miraglia RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Alan S. Loewinsohn and Kerry Schonwald, LOEWINSOHN FLEGLE DEARY SIMON LLP, Dallas, Texas; *Attorneys for Defendants and Counterclaim Plaintiffs CCI Historic, Inc., Compatriot Capital Inc., VG ECU Holdings, LLC, Village Green Holding, LLC, and Village Green Management Company, LLC.*

**FIORAVANTI, Vice Chancellor**

The parties in this action are real estate developers that are in the process of dividing jointly owned businesses in Pittsburgh, Pennsylvania as part of a "business divorce." One of the businesses to be divided was the Morrow Park City Apartments (the "Apartments" or the "Property"). To accomplish that division, the parties established limited liability companies with operating agreements governing the development and financing of the Apartments. These agreements contemplated that one of the two developers would purchase the Apartments from the other after they had been substantially completed and occupied. The agreements also established a process for determining the purchase price.

In 2016, one of the developers, Village Green Residential Properties, L.L.C. ("VGRP"), sought to exercise its right to acquire the Apartments by purchasing the interests of two of the defendants. Disagreements over the valuation process ensued, culminating in VGRP filing this action. The initial complaint sought specific performance and an injunction to enforce VGRP's purchase rights. The Court entered an injunction essentially maintaining the status quo until a final judgment as to the purchase price.

Since then, the disputes have grown. This litigation has expanded with the addition of new parties, claims, counterclaims, and third-party claims. There has also been related litigation in this Court and elsewhere. Most notably, during the course of this action, one of the defendants purchased the Apartments pursuant to

2

an order entered by a Pennsylvania court. The division of the sale proceeds is among the many issues to be resolved in this case.

The parties have filed cross-motions for partial summary judgment. For the reasons explained below, the motions are largely denied. The Court concludes that there are genuine disputes of material fact warranting denial of summary judgment on some of the issues. Two other factors have influenced the Court's decision to deny, for the most part, the cross-motions for summary judgment. First, the discovery record was still being developed after the parties had completed briefing the motions. Second, trial is scheduled for July 2020. These additional factors warrant denial of the motions on certain claims and issues so that the Court may "inquire more thoroughly into the facts in order to clarify application of the law." *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005).

## I. BACKGROUND

This Memorandum Opinion will only address those facts necessary to address the issues presented in the cross-motions for summary judgment. The

following facts are drawn from the verified amended pleadings[1] and the materials presented in support of the parties' summary judgment motions.

The summary judgment record includes more than 100 exhibits, including deposition transcripts, some of which were submitted after the parties had completed briefing.[2]  When the parties argued their cross-motions for summary judgment, fact and expert discovery had not yet been completed.  Multiple motions to compel remained outstanding, and several depositions were noticed to take place after the parties presented oral argument on the motions.[3]  Trial is currently scheduled to take place on July 13-17, 2020.

## A. The Parties and the Ownership Structure of the Morrow Park City Apartments

Plaintiffs' side of this dispute is composed of Jonathan Holtzman ("Holtzman") and certain affiliated companies:  Plaintiff VGRP, Plaintiff VGM

---

[1] The parties' operative pleadings are the Holtzman Parties' Master Consolidated and Amended Verified Complaint (Dkt. 250) (hereinafter, "Compl.") and the Compatriot Parties' Master Consolidated Counterclaim (Dkt. 265) (hereinafter, "Countercl.").

[2] Two key witnesses, Robert Platt and Mark Van Kirk, were deposed after summary judgment briefing was completed.  The parties submitted their deposition transcripts on the eve of oral argument and cited passages during argument, further contributing to a suboptimal summary judgment posture in a non-expedited case.

[3] *See* Dkt. 437 (Compatriot Parties' amended notice of deposition of Tom Frazee for May 11, 2020); Dkt. 428 (Compatriot Parties' notice of deposition of Jeff Rothbart for May 11, 2020); Dkt. 425 (Holtzman Parties' notice of deposition of Paul Rowsey for June 4, 2020); Dkt. 426 (Holtzman Parties' notice of deposition for Heather Kreager for June 5, 2020); Dkt. 423 (Compatriot Parties' notice of deposition of Roger Remblake for June 2, 2020 and Alan Greenberg for June 25, 2020).

Clearing, LLC (formerly known as Village Green Management Clearing Company) ("VGM Clearing"), and Counterclaim Defendant City Club Apartments, Inc. ("CCA" and, collectively with Holtzman, VGRP, and VGM Clearing, the "Holtzman Parties").

The Compatriot Parties form the other side of the dispute: Defendants and Counterclaim Plaintiffs CCI Historic, Inc. ("CCI"), VG ECU Holdings, LLC ("VG ECU"), Compatriot Capital, Inc. ("Compatriot"), Village Green Holding, LLC ("Village Green Holding"), and Village Green Management Company, LLC ("Village Green Management" and, collectively with CCI, VG ECU, Compatriot, and Village Green Holding, the "Compatriot Parties").

In 2011, CCI invested as a fifty-percent owner in the Village Green family of companies. The Holtzman family previously owned the Village Green family of companies and used the companies to develop and manage multifamily housing. By 2016, the relationship between the parties had deteriorated. To effectuate their separation, Village Green Holding, VGM Clearing, VGRP, CCI, VG ECU, and Holtzman entered into a Redemption Agreement, dated February 1, 2016 (the "Redemption Agreement").[4] Under the Redemption Agreement, Holtzman received the option to acquire corporate entities that controlled two then-unfinished

---

[4] The Redemption Agreement is attached as Exhibit 8 to the Holtzman Parties' Opening Brief in support of their Motion for Partial Summary Judgment.

5

properties, the Apartments and Southside Works, upon the fulfillment of certain conditions related to the two properties' construction and occupancy. The Redemption Agreement includes provisions for the development and ownership of the Apartments, including the formation of a jointly owned and managed "New Company" to hold membership interests in the Apartments.[5]

The parties to the Redemption Agreement formed Morrow Park Holding, LLC ("MP Holding") as the "New Company." As a result, MP Holding became the parent entity of a chain of entities that held the Apartments, as illustrated in the following chart:

---

[5] Redemption Agreement § 1.1(a)(iv).



MP Holding is co-managed by VGRP and CCI; they, along with VG ECU are the three members of MP Holding.[6] At the next tier down, MP Holding is the majority owner and manager of VG Morrow Park Capital LLC ("MP Managing"). Compatriot, the 100% owner of CCI, is the minority owner of MP Managing. At the third tier down, MP Managing is the majority owner and manager of Morrow Park City Apartments, LLC ("MP Operating"). MP Operating was previously

---

[6] VGRP and CCI own an equal number of Class B Preferred Units and Common Units of MP Holding. Non-managing member VG ECU owns Executive Common Units. *See* Compatriot Parties' Opening Br. Ex. B Schedule A.

minority owned by non-managing investor L.A.V. Associates, LP ("L.A.V."). L.A.V. sold its interests to CCI in March 2019 through an intermediate holding company, LAV MP Holding. MP Operating owned the Apartments until CCI purchased them, as described below.

In April 2017, L.A.V. instituted an action in the Court of Common Pleas of Allegheny County, Pennsylvania, No. GD-17-006216 (the "Pennsylvania Action"). The Pennsylvania court entered an order empowering a Special Master to "conduct and conclude a sale process" for the Apartments.[7] The Special Master recommended that the Apartments be sold to CCI with the net proceeds of the sale to be held by the Register in Chancery pending the outcome of this action. The Pennsylvania court accepted the Special Master's recommendation.[8] Accordingly, CCI purchased the Apartments, and the net proceeds of the sale are held by the Register in Chancery pending the resolution of this action.[9] The Holtzman Parties have appealed the Pennsylvania court's order authorizing the sale to CCI.[10]

---

[7] Holtzman Parties' Answering Br. Ex. 35 ¶ 4.

[8] Compatriot Parties' Answering Br. Ex. BB ¶ 3 ("The Special Master's March 5, 2019 recommendation for this Court to approve the sale of [the Apartments to CCI] . . . is accepted. The Court hereby authorizes the Special Master to accept the Offer for MPCA and proceed to close the sale in accordance with its terms.").

[9] *See* Holtzman Parties' Ans. to Countercl. ¶¶ 30-44.

[10] Dkt. 424 (letter from the Holtzman Parties stating that "there is an appeal pending by the Holtzman parties challenging the lower court's ruling which authorizes the special master to sell the Morrow Park Property to [CCI].").

**B.     The Operating Agreements**

The cross-motions for summary judgment center on the parties' respective contractual rights and obligations under the operating agreements of MP Holding (the "MP Holding Operating Agreement") and MP Managing (the "MP Managing Operating Agreement").[11]   To briefly summarize the contractual claims at issue, the Holtzman Parties argue that the Compatriot Parties breached the MP Holding Operating Agreement by interfering with VGRP's contractual right to purchase CCI's membership interest in MP Holding and Compatriot's membership interest in MP Managing (the "VGRP Purchase Right").  The Holtzman Parties also argue that the Compatriot Parties breached the MP Managing Operating Agreement by refusing to approve a permanent mortgage for the Apartments to replace the existing construction loan.  The parties also dispute the Compatriot Parties' entitlement to preferred returns on their membership interests in MP Holding, MP Managing, and MP Operating.  Each side contends that they are entitled to partial summary judgment on some of these claims.  It is useful at this point to introduce some of the contractual provisions that are central to this dispute.

---

[11] The MP Holding Operating Agreement and MP Managing Operating Agreement are attached as Exhibits B and C to the Compatriot Parties' Opening Brief in Support of Motion for Partial Summary Judgment.

## 1.  The MP Holding Operating Agreement Purchase Right

The first area of dispute concerns the VGRP Purchase Right and whether the Compatriot Parties interfered with VGRP's exercise of that right.

Section 10.10(a) of the MP Holding Operating Agreement gives VGRP the right to purchase CCI's membership interest in MP Holding and Compatriot's membership interest in MP Managing once the Apartments have been substantially completed and occupied.  The agreement refers to this as "Stabilization":

> (a) VGRP Purchase Right.  From and after the date of this Agreement and upon the occurrence of Stabilization with respect to the apartment project owned and operated by [MP Operating], VGRP shall have the first right to purchase from CCI and Compatriot, as applicable, and such Persons shall have the obligation to sell to VGRP, the entirety of both of (i) CCI's Membership Interests in the Company and (ii) Compatriot's membership interest in [MP Managing] on the terms hereinafter provided in this Section 10.10.  For purposes of this Agreement, "Stabilization" shall be defined as (x) [the Apartments] been substantially completed (subject only to punch list items that do not directly limit occupancy of units) and (y) such apartments having been at least 93% leased and occupied for at least 45 days.  The property manager of such apartments, designated as such by the Co-Managing Members, shall send prompt written notice to the Members at such time as Stabilization shall have occurred with respect to [the Apartments] (the "Notice of Stabilization").  VGRP must notify CCI in writing not later than 60 days after its receipt of the Notice of Stabilization whether or not it intends to exercise its purchase rights under this Section 10.10(a).[12]

Section 10.10(c) provides CCI a similar, secondary right to purchase VGRP's membership interest in MP Holding in the event that "VGRP determines

---

[12] MP Holding Operating Agreement § 10.10(a).

10

not to so exercise such purchase rights, or it fails to timely provide the written notice referenced in Section 10.10(a)" (the "CCI Purchase Right").[13]

Sections 10.10(b) and (d) provide that upon exercise of either purchase right, the purchaser shall pay an amount based on an "Appraised Value" of the Apartments.[14] Schedule C to the MP Holding Operating Agreement (the "Appraisal Schedule") prescribes the process of determining the Appraised Value. If the parties cannot reach agreement on an Appraised Value within fifteen days of the exercise of either purchase right, the Appraisal Schedule requires a three-appraiser process to establish the Appraised Value:

> As used herein, the term "Appraised Value" shall mean the fair market value of [the Apartments] as determined by an appraisal conducted as follows:
>
> 1. CCI and VGRP ("Parties") shall mutually seek to determine the Appraised Value of [the Apartments] for a fifteen (15) day period after the exercise of the VGRP Purchase Right or the CCI Purchase Right, as applicable. If the Parties are unable to reach an agreement within such period, then CCI shall designate an appraiser for the purpose of establishing the Appraised Value of [the Apartments], and shall give notice thereof in writing to VGRP ("Notification"). Within ten (10) days after CCI gives the Notification, VGRP shall designate a second appraiser for establishing the Appraised Value of [the Apartments], and shall give notice thereof in writing to CCI. If VGRP shall fail to timely appoint an appraiser, the appraiser appointed by CCI shall select the second appraiser within ten (10) days after VGRP['s] failure to appoint.

---

[13] *Id.* § 10.10(c).

[14] *Id.* § 10.10(b), (d).

2. The two appraisers so appointed shall appoint a mutually agreed third appraiser within ten (10) days following the selection of the second appraiser. If the two appraisers so appointed shall not be able to agree on the selection of a third appraiser within ten (10) days after the two initial appraisers have been appointed, then either appraiser, on behalf of both, may request such appointment by the head of the local chapter of the Appraisal Institute. The appraisers shall specialize in the appraisal of real estate projects similar to [the Apartments] in the region where [the Apartments] are located, shall have no less than five years' experience in such field and shall be recognized as ethical and reputable. No appraiser shall have any personal or financial interest as would disqualify such appraiser from exercising an independent and impartial judgment as to the value of [the Apartments]. The Appraised Value of [the Apartments] shall be equal to the average of the valuations of [the Apartments] as determined by the appraisers; provided, however, that if any appraiser's valuation for [the Apartments] deviates by more than ten percent (10%) from the average of the valuation of the other two appraisers for [the Apartments], the Appraised Value shall be determined by using the average of the other two appraisers' valuations. The cost of any such appraisals shall be paid by the Company. The appraisals shall be submitted to CCI and VGRP within thirty (30) days after the panel of three (3) appraisers is constituted. The decision of the appraisers shall be binding on the Members.[15]

### 2. The MP Managing Operating Agreement and the Business Plan

The second area of dispute concerns the financing of the Apartments. According to the Holtzman Parties, the parties would generally finance a project's construction with a construction loan, and when the project was complete, they would convert to "permanent" financing and secure a permanent loan.[16] In their motion for partial summary judgment, the Holtzman Parties argue that the MP

---

[15] *Id.* Schedule C.

[16] *Id.*; Holtzman Parties' Opening Br. Exs. 1 ¶ 6.3(a), 2 ¶ 6.3, 3 ¶ 6.3(a), 4 ¶ 6.3, 5 ¶6.3.

Managing Operating Agreement unambiguously requires the Compatriot Parties to approve financing for the Apartments by way of a permanent mortgage[17] at an 80% loan-to-value ratio and that the Compatriot Parties breached the contract by refusing to do so. The Compatriot Parties argue that the MP Managing Operating Agreement does not obligate any Compatriot Party to approve a permanent mortgage.

The Holtzman Parties focus their argument on a Business Plan, which is Exhibit B to the MP Managing Operating Agreement. Section 2.8(c) of the MP Managing Operating Agreement references the Business Plan:

> The Manager, in connection with the Development Company, has prepared a business plan attached as Exhibit B hereto (the "Business Plan"), which has been approved by Compatriot and incorporates (i) an acquisition and initial construction and development for costs related to the acquisition, design, development and lease-up of the Project ("Development Budget"), and (ii) a site plan for the [Apartments]. Any material changes or deviations from the Business Plan must be approved by Compatriot.[18]

---

[17] The parties use the term "permanent financing" throughout their briefing. For clarity and consistency, I have adopted the term "permanent mortgage," which is the phrase used in the MP Managing Operating Agreement. *See* MP Managing Operating Agreement § 6.2 ("the Members have approved a permanent mortgage for the Project, on market terms and conditions from an institutional lender, subject to the following factors . . . ."); *id.* at Ex. B (containing a table describing a "Permanent Mortgage Upon Stabilization").

[18] *Id.* § 2.8(c). Prior to the Redemption Agreement, the Manager of MP Managing was Village Green Holding. The Redemption Agreement made MP Holding the Manager of MP Managing. *See* Holtzman Parties' Opening Br. 7 n.1; Compatriot Parties' Answering Br. 9.

13

The Business Plan is broken into numerous subsections, each composed of a series of tables. The subsections are entitled "General and Operating Assumptions," "Development Timing and Cost Assumptions," "Equity and Debt Capitalization," "Equity Pricing / Projected Returns" and a "Development Budget."[19] As part of the section entitled "Equity and Debt Capitalization," the Business Plan includes a table contemplating a "Permanent Mortgage Upon Stabilization," as follows:

**PERMANENT MORTGAGE UPON STABILIZATION**

| | | | |
|---|---|---|---|
| Permanent Loan Date | 3 | (mths after Final CO) | Jan 1, 2016 |
| Stabilized NOI (NOI after RR) | | | $3,239,456 |
| Value (Before Tax Abatement) | | 6.00% cap rate | $53,990,931 |
| Plus: NPV of Tax Abatements | | | $3,689,378 |
| NET STABILIZED VALUE | | | $57,680,309 |
| Per Unit Value @ Stabilization | | | $270,800 |
| | | | |
| TOTAL LOAN AMOUNT | | 80.00% LTV | $46,144,247 |
| Less: Loan Fee/Costs (% of Permanent Loan Amount) | | 0.75% | ($346,082) |
| Less: Construction Loan Payoff | | | ($36,143,000) |
| Less: Amount needed to bring JV Equity Pref Current | | | ($1,554,781) |
| Plus: Rebates/Cable Fees/Grants | | | $92,655 |
| RETURN OF EQUITY FROM PERM LOAN | | | $8,193,040 |
| | | | |
| Interest Only Period (Mths) | | | 24 |
| Amortization (After I/O) (Yrs) | | | 30 |
| Fixed Interest Rate | | | 5.00% |
| Fully Amortizing Debt Service Coverage Ratio | | | 1.21 |

[20]

The Holtzman Parties also cite Section 6.2 of the MP Managing Operating Agreement as further evidence of an unambiguous contractual obligation for

---

[19] MP Managing Operating Agreement Ex. B.

[20] *Id.*

14

Compatriot to approve financing at an 80% loan-to-value ratio. Section 6.2(a) references the Business Plan and prohibits MP Holding, as the Manager of MP Managing, from "[a]dopt[ing], amend[ing] or modify[ing] all or any portion of the Business Plan" without the prior written approval of Compatriot, except with respect to certain immaterial expenditures.[21] Section 6.2(e) also references the Business Plan and prohibits MP Holding from entering into any loan secured by MP Managing's assets, except that MP Holding may enter into a permanent mortgage that satisfies certain conditions as approved by the Members of MP Managing (*i.e.,* MP Holding and Compatriot).[22]

In pertinent part, Section 6.2 states:

6.2 Limitations on Authority of Manager. Notwithstanding anything to the contrary contained in this Agreement (other than as expressly permitted in this Section 6.2), without the prior written approval of Compatriot, the Manager shall not have the power to do any of the following either directly or on behalf of the Project Owner (each, a "Major Decision"):

(a) Adopt, amend or modify all or any portion of the Business Plan or Annual Plan, or vary from the limitations set forth therein; provided, however, the Manager may make adjustments to individual cost and expense line items set forth on the Operating Budget without the approval of Compatriot . . . .

\* \* \*

---

[21] *Id.* § 6.2(a).

[22] *Id.* § 6.2(e).

(e) . . . subject all or any portion of the Company's or Project Owner's property (including, without limitation, the Project) to any mortgage, lien, or other encumbrance or pledge any Company or Project Owner assets; provided, pursuant to the Business Plan, the Members have approved a permanent mortgage for the Project, on market terms and conditions from an institutional lender, subject to the following factors: (1) an amount up to 80% loan to value (which value shall be ascertained at the time the permanent mortgage is being applied for); (2) non-recourse, with no guaranties by any party other than customary non-recourse carve-out guaranty by the Borrower or Village Green, (3) have a minimum term of 7 years, (4) amortization of not less than 25 years, (5) debt service coverage ratio of not less than 1.2 (with amortization), and (6) not more than 2 years interest-only payments.[23]

### a.     The Preferred Return Provisions

The operating agreements of MP Holding, MP Managing, and MP Operating each provide their investors, including certain of the Compatriot Parties, rights to accrue returns on their investments (the "Preferred Returns").[24]  The parties dispute whether the Compatriot Parties are entitled to accrue Preferred Returns during the pendency of this action.  The Holtzman Parties challenge the Compatriot Parties' right to accruals because of (1) the Compatriot Parties' opposition to the Holtzman Parties' proposed injunction at the outset of this action, which would have required

---

[23] *Id.* § 6.2(a), (e).

[24] The Compatriot Parties seek a declaration that the "(i) 9% Preferred Return in MP Operating was validly accrued, is accruing, and will continue to accrue until termination of MP Operating; (ii) [the] 13% Preferred Return in MP Managing was validly accrued, is accruing, and will continue to accrue until termination of MP Managing; and (iii) [the] 10% Preferred Return in MP Holding was validly accrued, is accruing, and will continue to accrue until termination of MP Holding [Operating] Agreement."  *See* Compatriot Parties' Opening Br. 36 & nn. 12-14 (citing Compatriot Parties' Opening Br. Exs. B §§ 4.3, 13.1; C §§ 5.2(a), 11.3(d); RR §§ 9.2, 9.3, 13.4).

CCI and Compatriot to sell their interests to VGRP pursuant to the VGRP Purchase Right, thereby ending their entitlement to the Preferred Returns, and (2) the Compatriot Parties' alleged breach of the MP Managing Operating Agreement by refusing to agree to a permanent mortgage.

### C. The Appraisal and Financing Negotiations Begin

According to the Holtzman Parties, they and the Compatriot Parties generally agreed upon a strategy to maximize leverage on the properties they jointly developed by financing a property's construction or rehabilitation with an initial construction loan and then, after the completion of the project, replacing the construction loan with a permanent mortgage. All funds borrowed through the permanent mortgage in excess of the construction loan would be distributed to the investors in a property, with the borrower repaying the permanent mortgage through revenues from renting the property.[25]

The record reflects that, as early as March 2016, even before MP Holding was established, the parties had begun the process of obtaining a permanent mortgage for the Property from Freddie Mac with Holliday Fenoglio Fowler, L.P.

---

[25] Holtzman Parties' Opening Br. 3-4; *see also* Dkt. 435, Tr. at 5:23-6:16 ("This is how the parties functioned for many years.").

17

("HFF") as a borrower representative.[26] In May 2016, while efforts to obtain a permanent mortgage through Freddie Mac were ongoing, the parties established MP Holding. As described above, under the MP Holding Operating Agreement, VGRP could exercise the VGRP Purchase Right once the Property reached Stabilization.

On September 23, 2016, VGRP provided a Notice of Stabilization to CCI stating that the Apartments had reached Stabilization.[27] The VGRP Purchase Right enabled VGRP to exercise its purchase right within sixty days of providing the Notice of Stabilization (in this case, on or before November 22, 2016).[28] The

---

[26] Compatriot Parties' Opening Br. Ex. D at CCI587126 ("What do you need to go out to Freddie and how early will they commit in their early rate lock program? We have explained the entire situation at VG with them so they know the deal so it may be beneficial to get this started with them as the mortgage will help us determine how the entire asset will move forward.").

[27] Holtzman Parties' Opening Br. Ex. 9.

[28] MP Holding Operating Agreement § 10.10(a) ("VGRP must notify CCI in writing not later than 60 days after its receipt of the Notice of Stabilization whether or not it intends to exercise its purchase rights under this Section 10.10(a).").

18

parties began negotiating over the Appraised Value at or around the time that VGRP delivered the Notice of Stabilization.[29]

During the parties' early negotiations, Jonathan Holtzman proposed that the parties establish the purchase price based upon the Freddie Mac appraisal to be obtained for the mortgage application.[30] After exchanging further proposals, the Compatriot Parties ultimately rejected using a single appraisal.[31] On September 30, 2016, Compatriot's Mark Van Kirk sent an email to VGRP's counsel Jonathan Borenstein saying "both parties should proceed with the 3-appraisal procedure already agreed upon in the Morrow Park documents."[32] Borenstein responded on October 5, 2016: "In terms of the appraisal process we each initiated appraisals, and use the mortgage appraisal as the third? I think its [sic] consistent with the

---

[29] The Appraisal Schedule provides that the parties "shall mutually seek to determine the Appraised Value of the [Apartments] for a fifteen (15) day period after the exercise of the VGRP Purchase Right or the CCI Purchase Right, as applicable." MP Holding Operating Agreement Schedule C. The cross-motions for summary judgment and the fact record submitted to the Court at this point suggest that the parties acted as though this fifteen-day period to reach agreement on the Appraised Value began upon issuance of the Notice of Stabilization on September 23, 2016 rather than VGRP's subsequent notice of the exercise of its purchase right in November 2016. *See* Compatriot Parties' Opening Br. Ex. H (stating on September 30, 2016 that the period to reach consensus on the Appraised Value "still has another 8 days to run."). The Appraisal Schedule suggests, however, that the appraisal period arguably began after VGRP provided notice that it was exercising its appraisal right within sixty days after providing Notice of Stabilization, not upon providing Notice of Stabilization.

[30] Compatriot Parties' Opening Br. Ex. H at CCI459657 and CCI459655.

[31] *See id.* at CCI459654.

[32] *Id.*

19

document, and it could be expedient?"[33]  Borenstein made clear that he had not raised that idea with Holtzman, but wanted to know what Van Kirk thought about it.[34]

The parties selected their respective appraisers in October 2016.  On October 10, 2016, CCI contacted Brian Flanagan of Property Valuation Advisors about potentially acting as its appraiser.  Flanagan told CCI that he had already been retained by VGRP.[35]  On October 18, 2016, CCI retained Todd Albert of Colliers International Valuation & Advisory Services, LLC ("Colliers").[36]

On October 19, 2016, CCI notified Borenstein via email that CCI had chosen Albert as its appraiser.[37]  On the same date, Robert Platt, Chief Investment Officer of CCA, responded on behalf of VGRP and notified CCI that VGRP had chosen Flanagan as its appraiser.  Both sides represented that their respective appraisers satisfied the qualification requirements in the MP Holding Operating

---

[33] *Id.*

[34] *Id.*

[35] Compatriot Parties' Opening Br. Ex. I.

[36] Compatriot Parties' Opening Br. Ex. J.

[37] Compatriot Parties' Opening Br. Ex. K. at CCI460516.  As the parties do in their briefing, the Court generally refers to the appraisers by the name of the individuals involved in the appraisal as opposed to the entities with which they are affiliated.

Agreement.[38]  The appraisers did not select a third appraiser within ten days of their designation, as contemplated by the Appraisal Schedule.

In his email notifying CCI that VGRP had selected Flanagan, Platt wrote:

As discussed, we have proposed using the mortgage loan appraisal for the third appraisal, in lieu of having these two appraisers select a third.  If you do not wish to pursue that, then both designated appraisers must be instructed to begin working on the appointment of the third appraiser.[39]

In response, CCI wrote:

Thanks, Rob.  Using the mortgage loan appraisal is ok with us as long as the lender will give both parties a copy of the appraisal.  I looked up Property Valuation Advisors on the internet and it appears that they are a small company based in Chicago, if my research is correct.  Would you please confirm with them that they have appraised multifamily in Pittsburgh and give us examples of same?[40]

The Compatriot Parties contend that these emails (the "October 19 Emails") amended the Appraisal Schedule to require the use of the mortgage appraisal as the third appraisal.

Platt responded and informed CCI that Property Valuation Advisors represented to VGRP that they "work in PA and eastern OH on a recurring basis

---

[38] *Id.* at CCI460515-6.

[39] *Id.* at CCI460516.

[40] *Id.* at CCI460515.

21

and most major Midwestern cities."[41] Platt's response did not further address the use of the mortgage appraisal.

### D. The Appraisal Negotiations Break Down

On November 8, 2016, Holtzman applied for financing from Freddie Mac in the form of a $47 million loan, with a loan-to-value ratio of 80%.[42] Apparently unbeknownst to the Holtzman Parties, soon after Holtzman applied for financing, HFF retained Albert (CCI's appraiser) to perform the appraisal for the Freddie Mac loan.[43] The Compatriot Parties became aware that Albert would be performing the appraisal for the Freddie Mac loan shortly after HFF had retained him, because Albert requested permission to use the information that CCI had provided to him for his Freddie Mac loan appraisal.[44]

On November 18, 2016, Holtzman emailed CCI a written notice of VGRP's exercise of the VGRP Purchase Right, effective as of November 22, 2016.[45] On the same date, CCI acknowledged receipt of the notice and proposed that each party and "the third-party appraiser" should reveal the "3 appraisers' values" the

---

[41] Holtzman Parties' Answering Br. Ex. 14 at CCI060457.

[42] Compatriot Parties' Opening Br. Ex. L. *See id.* at VGRP02094360 (specifying "Estimated Loan Amount" and "Maximum LTV").

[43] Compatriot Parties' Opening Br. Ex. N. *See also* Dkt. 425, Tr. at 10:10-13 ("That was not disclosed to my client. And as soon as we found that out, we objected.").

[44] Compatriot Parties' Opening Br. Ex. O.

[45] Compatriot Parties' Opening Br. Ex. P at CCI264665.

following week.[46] Holtzman replied: "We should follow the signed documents. We do not have three appraisals . . . . There have not been any changes to our documents. Please do not represent that there have been."[47] CCI responded that, "[w]e are following the documents. The documents require three appraisals. I am not representing that there have been any changes to the documents."[48]

On November 23, 2016, VGRP and CCI exchanged appraisals. VGRP's appraisal from Flanagan reflected a market value for the Property in fee simple as of November 2, 2016 of $54.6 million.[49] CCI's appraisal from Albert reflected a market value for the Property as of October 27, 2016 of $59 million.[50] On November 29, 2016, HFF sent to VGRP a draft Freddie Mac mortgage appraisal from Colliers reflecting a market value for the Property as of November 22, 2016

---

[46] *Id.* at CCI264664-5.

[47] *Id.* at CCI264664.

[48] *Id.*

[49] Compatriot Parties' Opening Br. Ex. Q

[50] Compatriot Parties' Opening Br. Ex. R (email transmitting the Albert appraisal on November 23, 2016); Countercl. ¶ 25 (Compatriot Parties alleging that "in January 2017, it was CCI's position that the Appraised Value should be determined by averaging the First Appraisal and Third Appraisal. Since the amount in those two appraisals, which was $59,000,000, was the same, the average produces the sum of $59,000,000 as the Appraised Value.").

of $59 million.[51]  The Freddie Mac mortgage appraisal was signed by Albert and by Clay Cassidy, a Senior Valuation Specialist from Colliers.[52]

After exchanging appraisals, the parties sought to reach agreement on the fair value of the Apartments but failed to do so.  On December 5, 2016, VGRP told Compatriot that "[t]he two appraisers should be instructed to immediately select a third appraiser, per the document.  If you do not wish to do that, we would ask that you make an offer (in writing) and we will respond."[53]  Compatriot responded the following day that it "is convinced that we have only two good appraisals for Morrow Park, ours and the one for the lender, both at $59 million."[54]  Compatriot argued that Flanagan did not "meet the standards set forth in [the Appraisal] Schedule."[55]  On December 8, 2016, VGRP objected to Compatriot's arguments, noting that "[w]hen we proposed the idea of using the loan appraisal for the third appraiser, we were unaware that the lender would be using the same appraiser."[56]

---

[51] Compatriot Parties' Opening Br. Ex. W.

[52] *Id.* at VGRP02193900.  Based on the Compatriot Parties' Opening Brief, this appears to be the appraisal that the Compatriot Parties contend should serve as the third appraisal. Compatriot Parties' Opening Br. 17-20.

[53] Compatriot Parties' Opening Br. Ex. CC at CCI021683.

[54] *Id.* at CCI021682.

[55] *Id.*

[56] *Id.* at CCI021681.

24

While the parties seemed to be at an impasse, the two appraisers selected a third appraiser. On December 19, 2016, Flanagan wrote to Albert "regarding picking a third appraiser for the assignment" and asked if he "ha[d] any recommendations."[57] On December 30, 2016, Flanagan notified VGRP that he and Albert had agreed upon Paul Griffith of Integra Realty Resources-Pittsburgh as the third independent appraiser, and that Griffith had agreed to be the third appraiser.[58] On January 5, Holtzman notified CCI of the two appraisers' agreement to use Griffith as the third appraiser.[59] Apparently mystified, the Compatriot Parties asked Albert about his involvement in selecting a third appraiser.[60] The following day, Compatriot sent an email to Holtzman disputing his portrayal of an agreement to select Griffith as a third appraiser. CCI stated that the parties had previously agreed to use the mortgage appraisal as the third appraisal and that Holtzman's attempt to use a "fourth appraisal" constituted a breach of the MP Operating Agreement.[61] Griffith did not prepare an appraisal of the Property.

---

[57] Holtzman Parties' Answering Br. Ex. 26 at VGRP02124373.

[58] Holtzman Parties' Answering Br. Ex. 27.

[59] Compatriot Parties' Opening Br. Ex. DD at CCI024565.

[60] Holtzman Parties' Answering Br. Ex. 29.

[61] Compatriot Parties' Opening Br. Ex. DD & Holtzman Parties' Opening Br. Ex. 13.

### E.     This Action Begins

With the closing deadline for the VGRP Purchase Right fast approaching, VGRP filed this action on January 17, 2017. VGRP also sought a temporary restraining order requiring CCI and Compatriot to sell their respective interests in MP Holding and MP Operating to VGRP pursuant to the VGRP Purchase Right. Towards that end, VGRP sought a mandatory injunction requiring completion of the third appraisal and consummation of the VGRP Purchase Right. CCI opposed the motion and proposed entry of a preliminary injunction. The Court denied VGRP's request for a mandatory injunction because VGRP had only satisfied the standard for a preliminary injunction. On January 20, 2017, the Court entered an order that the parties refer to as the "Status Quo Order," which, among other things, provides that the parties cannot transfer the membership interests at issue until thirty days after a non-appealable judgment as to the Appraised Value.[62]

### F.     Holtzman Seeks a Permanent Mortgage

On January 18, 2017, the day after VGRP initiated this action, Holtzman executed a mortgage loan commitment as the borrower for the Freddie Mac loan on behalf of MP Operating (the "January 2017 Financing Commitment).[63] The January 2017 Financing Commitment contemplated an 80% loan-to-value ratio at

---

[62] Dkt. No. 12. The order does not expressly state that it is a status quo order, but the parties and the Court have referred to it as such.

[63] Compatriot Parties' Opening Br. Ex. GG.

the origination of the loan.[64]  Five days later, on January 23, 2017, the Holtzman Parties caused the January 2017 Financing Commitment to become binding on behalf of MP Operating and provided a deposit to lock in the interest rate.[65]  The Holtzman Parties thereafter caused HFF to extend the January 2017 Financing Commitment.[66]

On March 2, 2017, the Holtzman Parties sent a version of the January 2017 Financing Commitment to the Compatriot Parties and requested that CCI execute a consent resolution approving the financing.[67]  The Compatriot Parties refused to consent to the financing.

## II.  STANDARD OF REVIEW

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Ct. Ch. R. 56(c).  The Court must

---

[64] *Id.* at CCI031600.

[65] Compatriot Parties' Opening Br. Ex. II at VGRP02061418.

[66] Compatriot Parties' Opening Br. Exs. JJ & KK.

[67] Compatriot Parties' Opening Br. Ex. LL at VGRP02078429.  The Holtzman Parties appear to have used an earlier version of the financing commitment with this letter.  The Compatriot Parties cite a later version of the financing commitment in their motion for partial summary judgment executed by HFF.  Compatriot Parties' Opening Br. Ex. GG at 2.  Neither party has argued that there is any substantive difference between the financing proposals.

view the facts in the light most favorable to the non-moving party.[68]  Similarly, and applicable here, "[w]hen opposing parties make cross motions for summary judgment, neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[69]  Any request for summary judgment "'must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom.'"[70]

"There is no 'right' to a summary judgment."[71]  Accordingly, "the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application."[72]

## III.  ANALYSIS

This opinion first considers the parties' motions for summary judgment on their core contractual claims.  These claims relate to: (1) the VGRP Purchase Right; (2) refusal to consent to a permanent mortgage for the Apartments; and (3) the

---

[68] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 100 (Del. 1992).

[69] *Shuba v. United Servs. Auto Ass'n*, 77 A.3d 945, 947 (Del. 2013) (internal citations omitted).

[70] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

[71] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[72] *In re El Paso*, 2014 WL 2768782, at *9 (citations omitted).

28

Compatriot Parties' entitlement to the Preferred Returns. This opinion next addresses the Compatriot Parties' motion for summary judgment on the Holtzman Parties' related claims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, tortious interference with contract and business relations, and civil conspiracy. Lastly, this opinion addresses the Compatriot Parties' argument that the Holtzman Parties lack standing to challenge either the sale of the Apartments to CCI in the Pennsylvania Action or the sale of the minority interest in MP Operating from L.A.V. to LAV MP Holding because none of the Holtzman Parties is a member of MP Operating.

## A. Appraisal Process Claims

The Compatriot Parties argue that they are entitled to summary judgment on VGRP's breach of contract claim (Compl. Count I), the Holtzman Parties' specific performance claim (Compl. Count XIII), and the Compatriot Parties' declaratory judgment claim (Countercl. Count V) as they relate to the appraisal process. Specifically, the Compatriot Parties argue: (1) VGRP was not entitled to exercise the VGRP Purchase Right based on Flanagan's appraisal because Flanagan was not validly licensed to perform the appraisal; (2) VGRP and CCI amended the Appraisal Schedule by agreeing to use the Freddie Mac mortgage appraisal performed by Colliers as the third appraisal; and (3) even in the absence of any

29

contractual amendment, an appraisal value was never set because a third appraiser was not validly selected.[73]

The Court denies the Compatriot Parties' motion for summary judgment on the appraisal process issues because the Compatriot Parties have not established their right to judgment as a matter of law.

### 1. Flanagan's Qualifications

The Appraisal Schedule describes the required qualifications for appraisers as follows:

> The appraisers shall specialize in the appraisal of real estate projects similar to [the Apartments] in the region where [the Apartments] are located, shall have no less than five years' experience in such field and shall be recognized as ethical and reputable. No appraiser shall have any personal or financial interest as would disqualify such appraiser from exercising an independent and impartial judgment as to the value of [the Apartments].[74]

The Compatriot Parties' summary judgment papers do not dispute that Flanagan met these requirements. Instead, according to the Compatriot Parties, VGRP could not validly rely on Flanagan's appraisal because Flanagan only held a "Pennsylvania Temporary Practice Permit." According to the Compatriot Parties, the permit only authorized Flanagan to provide appraisals as part of a "Federally-related transaction" and, therefore, the permit did not license him to conduct the

---

[73] Compatriot Parties' Opening Br. 29-35.

[74] MP Holding Operating Agreement Schedule C.

appraisal of the Apartments.[75]   This argument fails because, as the Compatriot Parties admit, the Appraisal Schedule does not require the appraisers to hold any particular permit, certification, or license.[76]

Under the plain language of the Appraisal Schedule, an individual could satisfy the requirements in the Appraisal Schedule by "specializ[ing] in the appraisal of real estate similar to [the Apartments] in the region where [the Apartments] are located," "have five years' experience," and "be recognized as ethical and reputable."[77]

The Compatriot Parties cite no law supporting their argument that VGRP could not validly rely on Flanagan's appraisal.  The Compatriot Parties cite two cases from the Commonwealth Court of Pennsylvania for the proposition that any real estate-related financial transaction "requires an appraisal [to] be conducted by an appraiser with a real estate appraiser license."[78]   Neither case addresses whether two sophisticated parties may agree to resolve a valuation dispute involving real estate utilizing an appraiser who does not possess a particular license or permit—

[75] Compatriot Parties' Opening Br. 30-32.

[76] Dkt. 435, Tr. at 82-83.

[77] MP Holding Operating Agreement Schedule C.  It is noteworthy that CCI tried to retain Flanagan after VGRP had already done so and that the challenge to his qualifications was not made until after he submitted his appraisal.

[78] Compatriot Parties' Opening Br. 31-32 (citing *King v. West Penn Power Co.*, 946 A.2d 184, 187-88 (Pa. Commw. Ct. 2008), and *McGaffic v. Redevelopment Auth. of City of New Castle*, 732 A.2d 663, 672 (Pa. Commw. Ct. 1999)).

temporary or otherwise. Instead, the two cited cases involve individuals offering expert testimony at trial. In both cases, the court held that a trial court may consider expert testimony regarding the valuation of a property in a condemnation proceeding even if the expert is not licensed.[79] Those cases are not controlling here. The parties here agreed upon specific qualifications for the appraisers. Holding a particular license was not one of them. Thus, there is a genuine issue of material fact as to whether Flanagan was sufficiently qualified to serve as an appraiser under the contract. Therefore, the Compatriot Parties are not entitled to judgment as a matter of law that Flanagan's appraisal was invalid under the terms of the Appraisal Schedule.[80]

### 2. The Amendment to the MP Holding Operating Agreement

The Compatriot Parties argue they are entitled to a partial summary judgment declaring that the parties amended the Appraisal Schedule to the MP

---

[79] *King*, 946 A.2d at 187 ("Condemnee first argues that the trial court erred in concluding that a qualified valuation expert testifying in a condemnation proceeding must possess a real estate appraiser license. We agree."); *McGaffic*, 732 A.2d at 673 (holding that the Pennsylvania statute requiring state certification for nonfederally-related appraisals did not apply to the appraisal at issue and that the "lack of certification did not operate to disqualify" the challenged expert). Further, the Compatriot Parties only argue that Flanagan's appraisal exceeded the scope of his permit. Even assuming that Flanagan's appraisal exceeded the scope of his permit, the Compatriot Parties have not established that VGRP could not rely on his appraisal as a matter of law.

[80] *See Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006) ("[C]ourts should be most chary about implying a contractual protection when the contract easily could have been drafted to expressly provide for it.").

Holding Operating Agreement. The Compatriot Parties contend VGRP and CCI amended the Appraisal Schedule to use the Freddie Mac mortgage appraisal as the third appraisal.

For the parties to have amended the Appraisal Schedule, they must have mutually assented to the amendment.[81] The Compatriot Parties cite the October 19 Emails as evidence of mutual assent to use the mortgage appraisal as the third appraisal.[82] That evidence, along with Platt's deposition testimony that VGRP "agreed that we would use the lender's appraisal," does suggest that the parties validly amended the Appraisal Schedule to use the appraisal for the Freddie Mac loan as the third appraisal.[83]

Yet there is other evidence indicating the parties had not mutually assented to use the mortgage appraisal as the third appraisal. On November 18, 2016, CCI wrote to Holtzman and stated that VGRP, CCI, and the "third-party appraiser" should reveal the "3 appraisers' values" the following week.[84] Perhaps understandably confused by the short time frame in which CCI was contemplating

---

[81] *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000) ("Any amendment to a contract, whether written or oral, relies on the presence of mutual assent and consideration.").

[82] Compatriot Parties' Opening Br. Ex. K ("[W]e have proposed using the mortgage loan appraisal for the third appraisal, in lieu of having these two appraisers select a third.").

[83] Dkt. 416 Ex. A, Platt Dep. 67:19-24.

[84] Compatriot Parties' Opening Br. Ex. P at CCI264664-5.

exchanging a third appraisal, Holtzman stated that "[t]here have not been any changes to our documents. Please do not represent that there have been."[85] Compatriot's Mark Van Kirk responded: "We are following the documents. The documents require three appraisals. I am not representing that there have been any changes to the documents."[86] These emails are inconsistent with an amendment to the Appraisal Schedule to use the mortgage appraisal as the third appraisal. Furthermore, if the parties had amended the Appraisal Schedule, Flanagan and Albert would not have needed to select Griffith.[87] Based on this record and drawing all reasonable inferences in favor of the Holtzman Parties, the Court cannot conclude as a matter of law that the parties amended the Appraisal Schedule.

Even if the parties had amended the Appraisal Schedule, the Compatriot Parties have not established that the parties amended the independence requirements described in paragraph 2 of the Appraisal Schedule. Paragraph 1 of the Appraisal Schedule governs the selection of the two appraisers and their

---

[85] *Id.* at CCI264664.

[86] *Id.*

[87] The Compatriot Parties argue that Griffith was appointed too late, that Holtzman was not authorized unilaterally to retain Griffith on behalf of MP Holding, and that Griffith never ultimately prepared an appraisal. *See* Compatriot Parties' Opening Br. 21. The Compatriot Parties do not argue, however, that Albert was not authorized to select a third appraiser or that his selection was otherwise invalid.

34

selection of a third appraiser. Paragraph 2 of the Appraisal Schedule states that "[n]o appraiser shall have any personal or financial interest as would disqualify such appraiser from exercising an independent and impartial judgment as to the value of the [Apartments]."[88] The Compatriot Parties argue that the Holtzman Parties' offer to use the mortgage appraisal as the third appraisal was not conditioned on any independence requirement and, therefore, the parties effectively erased paragraph 2. It is also reasonable to infer, however, that the parties only modified the process to select a third appraiser in paragraph 1 and did not intend to modify the independence requirements in paragraph 2. Thus, if the parties amended the Appraisal Schedule to use the mortgage appraisal, the independence requirement could nevertheless disqualify Albert as a valid third appraiser because there is a material dispute of fact regarding whether Albert satisfied the independence requirements.[89] Accordingly, the Compatriot Parties are not entitled to a summary judgment that the parties amended the Appraisal Schedule in the MP Holding Operating Agreement.

### 3. The Lack of a Third Appraiser

The Compatriot Parties argue that, even if there were no amendment to the Appraisal Schedule, Albert and Flanagan did not appoint a third appraiser within

---

[88] MP Holding Operating Agreement Schedule C.

[89] *See* Holtzman Parties' Answering Br. 38-40.

ten days after they were appointed, as provided in the Appraisal Schedule and, thus, there is no valid third appraisal for the VGRP Purchase Right.[90]  This argument fails because it assumes that the Compatriot Parties did not breach any contract by causing the failure of the appraisal process.  Further, the record could support a finding that both VGRP and CCI agreed through their course of conduct that the ten-day period for appointing appraisers set forth in the Appraisal Schedule would not restrict the nomination of the third appraiser.[91]  In any event, this Court has already ruled that damages could include judgment as to the Appraised Value.  The

---

[90] Compatriot Parties' Opening Br. 35.

[91] It appears that the parties often did not strictly comply with the deadlines and other provisions of the Appraisal Schedule.  In addition to arguably beginning the appraisal process on an earlier date than contemplated by the Appraisal Schedule, *see supra* at n.29, the parties were not supposed to exchange appraisals until after a third appraiser was empaneled and had conducted an appraisal of the Property.  *See* MP Holding Operating Agreement Schedule C ¶ 1 ("The appraisals shall be submitted to CCI and VGRP within thirty (30) days after the panel of three (3) appraisers is constituted.").  Nevertheless, the parties exchanged appraisals from just two appraisers on November 23, 2016, before the two appraisers had selected a third appraiser.  More consequentially, the record implies that at least one (if not both) of the parties effectively prevented its respective appraiser from selecting a third appraiser while the parties sought to reach agreement on the fair value of the Apartments.  *See* Holtzman Parties' Answering Br. Ex. 30 (Compatriot asking Albert "were you provided with the relevant provisions of the LLC Agreement and did you know you were selecting a third appraiser for the purposes set forth in the LLC Agreement? Obviously we did not provide you with the relevant positions of the LLC agreement but I wanted to see if you were provided anything from the other appraiser and you knew at any level why Mr. Flanagan was approaching you and asking for your recommendations of other appraisers"); Compatriot Parties' Opening Br. Ex. CC (Holtzman noting that the parties should instruct both appraisers to select a third appraiser in December 2016).  In the context of this case, these largely unheralded deviations from the contractual process underscore the need for a fuller record before adjudicating the contract claims.

Court's Status Quo Order permits "a final, non-appealable judgment as to the Appraised Value."[92] Just as the Status Quo Order contemplated that the Court could issue a judgment as to the Appraised Value at the outset of this action over three years ago, it remains possible that VGRP may be entitled to a judgment through which the appraisal process resumes or the appraised value of the Apartments is otherwise determined by the Court.

**B.    Were Any of the Compatriot Parties Obligated to Approve the Freddie Mac Financing?**

Both the Holtzman Parties and the Compatriot Parties seek summary judgment in their favor on the Holtzman Parties' claim that the Compatriot Parties breached the MP Managing Operating Agreement by obstructing the Freddie Mac financing.[93] The Holtzman Parties contend that the MP Managing Operating Agreement unambiguously required the Compatriot Parties to approve the Freddie Mac financing, and their failure or refusal to do so breached the contract. The Compatriot Parties argue they owed no contractual obligation to approve any financing, and even if they did, the financing did not meet the contractual requirements for approval. The Compatriot Parties further argue that no breach occurred because VGRP requested consent from the wrong Compatriot Party and

___

[92] Dkt. 12 ¶ 2.

[93] Compl. Count I.

that Holtzman made certain inaccurate representations to Freddie Mac in obtaining the financing proposal.

As discussed below, the parties have not satisfied their burden to obtain summary judgment on this issue. Furthermore, additional factual development would be helpful to the Court in resolving this claim.

### 1. The Contractual Provisions for Financing the Apartments

Neither side has adequately established CCI's and Compatriot's contractual obligations to approve permanent mortgage financing, if any.

#### a. The Holtzman Parties' Interpretation of the Financing Provisions

None of the provisions in the MP Managing Operating Agreement expressly and unambiguously obligated Compatriot or CCI (as a Member of MP Holding) to approve the Freddie Mac financing on the basis that the Freddie Mac financing contemplated a loan at an 80% loan-to-value ratio. Section 2.8(c) to the MP Managing Operating Agreement incorporates a Business Plan that had been approved by Compatriot and required Compatriot's approval to revise the Business Plan:

> The Manager, in connection with the Development Company, has prepared a business plan attached as Exhibit B hereto (the "Business Plan"), which has been approved by Compatriot and incorporates (i) an acquisition and initial construction and development for costs related to the acquisition, design, development and lease-up of the Project ("Development Budget"), and (ii) a

site plan for the [Apartments].  Any material changes or deviations from the Business Plan must be approved by Compatriot.[94]

The Business Plan does not unambiguously state that Compatriot or CCI is obligated to approve any financing at an 80% loan-to-value ratio.  Among many other details, the Business Plan contains a table of terms illustrating a permanent mortgage, without any language expressly obligating any party to approve the permanent mortgage described therein.

Section 6.2 prohibits MP Holding, as the Manager of MP Managing, from undertaking certain actions without prior written approval from Compatriot. Section 6.2(a) prohibits MP Holding from "adopt[ing], amend[ing] or modify[ing] the Business Plan" unless the transactions at issue fall below a certain materiality threshold.  Section 6.2(e) prohibits MP Holding from encumbering the Company, subject to an exception for a permanent mortgage on certain terms:

> pursuant to the Business Plan, the Members have approved a permanent mortgage for the Project, on market terms and conditions from an institutional lender, subject to the following factors: (1) an amount up to 80% loan to value (which value shall be ascertained at the time the permanent mortgage is being applied for); (2) non-recourse, with no guaranties by any party other than customary non-recourse carve-out guaranty by the Borrower or Village Green, (3) have a minimum term of 7 years, (4) amortization of not less than 25 years, (5) debt service coverage ratio of not less than 1.2 (with amortization), and (6) not more than 2 years interest-only payments.

---

[94] MP Managing Operating Agreement § 2.8(c).

Section 6.2(e) does not unambiguously require CCI or Compatriot to approve any permanent mortgage in an amount up to an 80% loan-to-value ratio. Instead, Section 6.2(e) permits MP Holding (which is co-managed by VGRP and CCI) to obtain a permanent mortgage that satisfies all of the terms listed without Compatriot's approval. The Compatriot Parties argue that the Freddie Mac financing did not satisfy all of the terms listed in Section 6.2(e).[95] Because the MP Managing Operating Agreement does not unambiguously require either Compatriot or CCI to approve an 80% loan-to-value permanent mortgage, the Holtzman Parties have not established as a matter of law that any of the Compatriot Parties were obligated to accept the Freddie Mac financing.

### b. The Compatriot Parties' Interpretation of the Financing Provisions

The Compatriot Parties argue that Compatriot and CCI owed no obligation to approve any permanent mortgage on any terms because the Business Plan does not obligate any Compatriot Party to affirmatively do anything; instead, it only

---

[95] Compatriot Parties' Opening Br. 43-45.

operates to limit MP Holding as the Manager of MP Managing.[96] In the plainest terms, the Compatriot Parties argue that "[t]he Business Plan did not impose any obligations."[97] That is a reasonable construction of the contract, but it is not the only one. The inclusion of the Business Plan can be reasonably read to obligate the parties to act consistently with the Business Plan. The Business Plan describes the anticipated development and financing of the Apartments in detail, and it contemplates that the parties would obtain a permanent mortgage for the Apartments.[98] It is a reasonable reading of the contract that Compatriot and CCI

---

[96] *See* MP Managing Operating Agreement §§ 2.8(c) ("Any material changes or deviations from the Business Plan must be approved by Compatriot."), 6.2(a) (prohibiting the Manager from adopting, amending or modifying "all or any part of the Business Plan" without Compatriot's written consent), 6.2(e) (prohibiting the Manager from encumbering the Company without Compatriot's written consent except with respect to a permanent mortgage satisfying certain criteria); *see also* MP Holding Operating Agreement § 5.5 (permitting CCI to act in a self-interested manner as a member of MP Holding).

[97] Compatriot Parties' Reply Br. 27 n.10.

[98] Section 2.8(c) states that Compatriot "approved the Business Plan," and the same section permits immaterial changes to the Business Plan without Compatriot's approval. MP Managing Operating Agreement § 2.8(c). The Business Plan also defines MP Holding's authority to manage MP Managing without Compatriot's consent, which could indicate that MP Holding (as co-managed by VGRP and CCI) was contractually obligated to undertake affirmative action to develop and finance the Property in a manner consistent with the Business Plan. *See, e.g.*, MP Managing Operating Agreement §§ 6.2(b) (permitting the Manager to sell property "in accordance with the approved Business Plan"), 6.2(d) (permitting the Manager to conduct repairs or capital improvements "approved in or contemplated by the Business Plan" under certain circumstances), 6.2(c) (describing an approved permanent mortgage by the Members "pursuant to the Business Plan"), 6.2(l) (permitting the Manager to enter into material contracts for legal, accounting, engineering and other services "to the extent the costs of which are set forth in the approved Business Plan").

41

were required to materially comply with the Business Plan, including by approving a permanent mortgage on materially similar terms to the one described therein.[99] Because the Holtzman Parties argue that any differences between the Freddie Mac mortgage and the permanent mortgage described in the Business Plan and Section 6.2(e) of the MP Managing Operating Agreement are immaterial,[100] summary judgment is inappropriate on this claim. *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 784 (Del. 2012) ("We reaffirm that, in a dispute

[99] *See* MP Managing Operating Agreement § 2.8(c) ("The Manager, in connection with the Development Company, has prepared a business plan attached as Exhibit B hereto (the "Business Plan"), which has been approved by Compatriot . . . . Any material changes or deviations from the Business Plan must be approved by Compatriot."). The Compatriot Parties argue that any authority that MP Holding had under the MP Managing Operating Agreement was still subject to CCI's right to act in its own self-interest as a co-manager of MP Holding. MP Holding Operating Agreement § 5.1 (requiring decisions of MP Holding to be unanimously approved by its members). It is possible, as the Compatriot Parties argue, that Compatriot and CCI effectively negotiated the contracts so that Compatriot had a veto right on operations at the MP Managing level and CCI had a redundant veto right at the MP Holding level. The Compatriot Parties acknowledge, however, that the contractual right to act in their own self-interest is not without limits. *See* Dkt. 435, Tr. at 98:20-99:21. In addition, applying CCI's right to act in its own self-interest in this context arguably renders the contract language regarding Compatriot's approval of the Business Plan and the permission given to MP Holding to make immaterial "changes or deviations from the Business Plan" without approval by Compatriot into surplusage. *In re Shorenstein Hays-Nederlander Theaters LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) ("We interpret contracts as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage, and will not read a contract to render a provision or term meaningless or illusory.") (internal quotations omitted).

[100] *See* Holtzman Parties' Answering Br. 49 (arguing that any "inconsistencies between the Freddie Mac loan commitment and the Business Plan raise a fact issue" and that these inconsistencies are "immaterial issues that could be easily remedied"). *But see* Dkt. 435, Tr. at 18:20-22 (stating that the permanent mortgage "complies in all respects to the language that's set forth in the [MP Managing Operating Agreement].").

over the proper interpretation of a contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation.").

The Compatriot Parties also raise numerous factual and legal issues concerning the interrelationship between the Business Plan, Section 6.2 of the MP Managing Operating Agreement, Section 5.5 of the MP Holding Operating Agreement, and the factual circumstances surrounding the Freddie Mac loan.[101] There are genuine issues of material fact as to whether the Holtzman Parties properly sought consent for the Freddie Mac mortgage and whether the mortgage proposal was properly obtained. The Compatriot Parties argue that Holtzman asked only CCI to consent (in its capacity as co-manager of MP Holding) rather than requesting consent of Compatriot—whose consent was required under Section 6.2 if the permanent mortgage did not satisfy the terms in Section 6.2(e).[102] Yet Compatriot's counsel sent an email to Holtzman in March 2017 acknowledging that Compatriot had been asked to consent to the Freddie Mac mortgage.[103] The Compatriot Parties minimize the import of this exchange and argue that the email cannot "fairly be read as suggesting the Holtzman Parties ever sought Compatriot's

---

[101] *See, e.g.*, Dkt. 435, Tr. 53-58.

[102] Compatriot Parties' Answering Br. 33-34.

[103] Compatriot Parties' Answering Br. Ex. S.

written approval under Section 6.2(e),"[104] but the Court cannot make those inferences in favor of the Compatriot Parties at this stage. These communications present a disputed issue of material fact.

The factual and legal determinations to be made are further complicated by the fact that this litigation began after a permanent mortgage had been approved.[105] At the time the Freddie Mac loan appraisal was sought, the parties were proceeding as though VGRP would be purchasing Compatriot's and CCI's interests in MP Holding. The Court's January 2017 Status Quo Order changed that dynamic by preventing a sale of any party's membership interest until 30 days after a final judgment in this action. Thus, in early March 2017, with the construction loan on the Apartments coming due in May 2017, the Holtzman Parties wrote to the Compatriot Parties' counsel seeking "permanent financing [to] achieve the business plan" through the Freddie Mac loan, and attached a loan commitment letter. Holtzman's counsel stated: "Because the loan was originally secured in connection with the buy-out of CCI Historic's interest, the loan documents will need to be conformed based on the current ownership structure. We are confident

---

[104] Compatriot Parties' Answering Br. 35 n.13. The Compatriot Parties referenced that argument in its reply brief in support of summary judgment. *See* Compatriot Parties' Reply Br. 26-27 (referencing the Compatriot Parties' answering brief in opposition to the Holtzman Parties' motion for summary judgment at pages 25-45).

[105] *See* MP Managing Operating Agreement § 6.2(e).

that Freddie Mac will support this modification."[106]  On March 6, 2017, counsel for CCI and Compatriot rejected that request, stating, among other things, that "Compatriot does not approve the financing."[107]  On April 3, 2017, Compatriot's CEO sent an email to Holtzman and explained that "[w]e rejected that proposed loan because, among other reasons, we felt that the loan amount comprised too much leverage at this point in the market cycle, not to mention that the loan terms you gave us didn't even contemplate Compatriot's continuing ownership in the property."[108]  He also stated that Compatriot, as the authorized person for one of the co-managers of MP Holding, supported extending the existing construction loan for one year, and attached a signed notice extending the construction loan.[109]

In sum, the issue of whether CCI breached a contractual obligation to approve permanent financing for the Apartments is fact-intensive and, as noted above, there are genuine issues of material fact that require denial of the

---

[106] Compatriot Parties' Answering Br. Ex. R.

[107] Compatriot Parties' Answering Br. Ex. S.

[108] Compatriot Parties' Answering Br. Ex. U.  The Compatriot Parties argue that Holtzman acted improperly in obtaining approval from Freddie Mac because Holtzman inaccurately represented to Freddie Mac that he had the authority to bind MP Operating. However, the Compatriot Parties have not offered any legal argument explaining why the purportedly inaccurate representations to Freddie Mac would invalidate any obligation on the part of Compatriot to approve the financing.  For example, the Compatriot Parties offer no evidence that Freddie Mac sought to withdraw the proposed financing as a consequence of the purported misrepresentations or that approving the proposed financing would have been futile.

[109] *Id.*

Compatriot Parties' motion as to some of the grounds upon which they seek summary judgment on the financing issues. The Court also concludes further development of the factual record at trial will "help clarify the application of the law to the circumstances of the case." *Bouchard v. Braidy Indus., Inc.*, 2020 WL 2036601, at *16 (Del. Ch. Apr. 28, 2020) (declining to grant summary judgment where each side "raised a bloody onslaught of arguments concerning the effectiveness of" certain actions). That is particularly so where, as here, additional factual discovery has occurred after briefing and argument on the motions for summary judgment. *See In re Energy Transfer Equity L.P. Unitholder Litig.*, 2017 WL 782495, at *15 (Del. Ch. Feb. 28, 2017) (declining to grant summary judgment on a question involving contract construction where the "record [was] incomplete, or in dispute, on issues helpful to [the court's] analysis").

### C. The Preferred Returns

Both parties seek summary judgment on the issue of the Compatriot Parties' right to the Preferred Returns.

The Compatriot Parties seek a summary judgment declaring that the Preferred Returns under the MP Holding Operating Agreement, MP Managing Operating Agreement, and the MP Operating Operating Agreement continue to

accrue until the termination of the respective agreements or the entities.[110] As the Compatriot Parties tacitly acknowledge, however, if the Compatriot Parties are liable for breach of contract or breach of the implied covenant of good faith and fair dealing by refusing to approve the Freddie Mac financing, it is possible that the Compatriot Parties' rights to the Preferred Returns could have terminated prior to the present.[111] Because the Court denies summary judgment as to the Holtzman Parties' breach of contract claims, the Compatriot Parties are not entitled to a declaration at the summary judgment stage that the Preferred Returns have continued to accrue. Accordingly, the Compatriot Parties' motion for declaratory relief as to their rights to accrue Preferred Returns (Counterclaim Count IX) is denied.

The Holtzman Parties' motion for summary judgment on this issue (Complaint Count XIII) must also be denied. According to the Holtzman Parties, the doctrine of judicial estoppel precludes the Compatriot Parties from obtaining the Preferred Returns after the Status Quo Order.[112] "Judicial estoppel is an 'equitable

---

[110] Compatriot Parties' Opening Br. 36-40.

[111] Compatriot Parties' Opening Br. 38 ("As discussed in the below argument sections, however, Sections 6.2(e) and (f) were not breached, and the implied covenant is not implicated.").

[112] Holtzman Parties' Opening Br. 21-22.

doctrine invoked by a court at its discretion.'"[113]  Judicial estoppel applies where "(i) 'a litigant advances a position inconsistent with a position taken in the same or earlier legal proceeding' and (ii) 'the court was persuaded to accept the previous argument as a basis for its earlier ruling.'"[114]  It is designed to protect the integrity of the judicial process by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"[115]

Here, the Compatriot Parties opposed a mandatory injunction requiring CCI and Compatriot to sell their membership interests pursuant to the VGRP Purchase Right.  In lieu of a mandatory injunction, the Compatriot Parties argued for (and obtained) an injunction preserving the parties' rights with respect to the VGRP Purchase Right and the CCI Purchase Right (the exercise of which is necessarily contingent on the exercise of the VGRP Purchase Right).  The Compatriot Parties' counterclaim seeks a declaration that the Compatriot Parties are entitled to the

---

[113] *Banther v. State*, 977 A.2d 870, 884 (Del. 2009) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).

[114] *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 246 (Del. Ch. 2014) (quoting *VIII-Hotel II P Loan Portfolio Hldgs., LLC v. Zimmerman*, 2013 WL 5785290, at *3 (Del. Super. Sept. 19, 2013)).

[115] *In re Silver Leaf, L.L.C.*, 2004 WL 1517127, at *2 (Del. Ch. June 29, 2004) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001)); *see also Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859-60 (Del. Oct. 8, 2008) ("The doctrine is meant to protect the integrity of the judicial proceedings."); *see generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.02(d), at 15-12 (2d ed. 2019) ("The doctrine of judicial estoppel is intended fundamentally to preserve the integrity of the courts and prevent miscarriages of justice by focusing on the relationship of the parties to the judicial system.").

Preferred Returns during the injunction. These positions are logically consistent: the Compatriot Parties' position is that they did not breach any contract and, therefore, they are entitled to (1) exercise the CCI Purchase Right after the expiration of the Status Quo Order, and (2) obtain the Preferred Returns that continued to accrue while they were prevented from exercising the CCI Purchase Right by operation of the Status Quo Order. Because the Compatriot Parties' position as to their entitlement to the Preferred Returns has not been inconsistent, the Compatriot Parties are not judicially estopped from seeking Preferred Returns.

## D. The Implied Covenant of Good Faith and Fair Dealing Claim

The implied covenant of good faith and fair dealing inheres in every contract governed by Delaware law and requires "'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[116] "[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract." *Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009). "The doctrine

---

[116] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1995)).

49

thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

As the Delaware Supreme Court has recently stated:

The implied covenant of good faith is a cautious enterprise that is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions. Delaware's implied duty of good faith and fair dealing is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract. Rather, the covenant is a limited and extraordinary legal remedy. As such, the implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand. Even where the contract is silent, an interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.

*Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acquisition, Inc.*, 202 A.3d 482, 506-07 (Del. 2019) (internal quotations and citations omitted); *see also id.* at 504 n.93.

As a threshold matter, the Compatriot Parties argue that the Holtzman Parties have failed to allege a breach of the implied covenant in their Complaint. The Compatriot Parties correctly note that the Holtzman Parties' Complaint does not contain a specific count asserting the implied covenant of good faith and fair

50

dealing. Nevertheless, the Complaint,[117] the Holtzman Parties' discovery responses,[118] and their brief in opposition to the Compatriot Parties' motion for partial summary judgment[119] establish the factual foundation for the Holtzman Parties' claim that the Compatriot Parties breached the implied covenant. At this stage, this is sufficient for the Holtzman Parties' implied covenant claim to proceed because the Holtzman Parties have provided fair notice of the claim.[120]

---

[117] *See, e.g.*, Compl. ¶¶ 13-15, 95.

[118] *See, e.g.*, Compatriot Parties' Opening Br. Ex. PP (Interrogatory Responses 8, 36, 39, 50, 106).

[119] *See* Holtzman Parties' Answering Br. 50-52 ("Holtzman bargained for his buyout rights and the three independent-appraisal process; Compatriot obstructed the process in order to forestall the buyout. And Holtzman bargained for a Business Plan with 80 percent financing; Compatriot obstructed it and denied Holtzman the bargained-for distribution").

[120] In *HOMF II Inv. Corp v. Altenberg*, 2020 WL 2529806, at *36-41 (Del. Ch. May 19, 2020), this Court recently considered whether a fraudulent inducement claim could proceed despite the failure to separately plead that legal theory as a count in the pleadings. The Court held that "the failure of the amended complaint to address [the claim] would not have foreclosed the plaintiffs from conducting discovery into these issues or seeking to prove a fraudulent inducement claim at trial, if the plaintiffs had given Altenberg fair notice that they intended to do so."

Here, the Compatriot Parties have fair notice of the basis for the implied covenant claim because, among other reasons, the parties have joined issue on this claim in their respective summary judgment briefing. *See HOMF II*, 2020 WL 2529806, at *37 (analyzing Court of Chancery Rule 15(b) by analogy to the Federal Rules of Civil Procedure and noting that the analogous federal rule "contemplate[s] that the parties will identify the issues for decision through discovery, motions for summary judgment, and 'the use of pretrial conferences and pretrial orders under Rule 16.'") (quoting 6A Charles Allen Wright et al., *Federal Practice and Procedure* § 1219 (3d ed. 2004 & Supp. 2020)).

As to the Appraisal Schedule, the Court concludes that further development of and inquiry into the factual record is desirable to clarify the application of the facts to the law concerning the implied covenant. As described above, the summary judgment record suggests that the parties may have tacitly agreed to depart from the terms of the Appraisal Schedule with respect to some of its provisions.[121] In the absence of a fuller record, it is not clear what legal import the parties' course of conduct has on the implied covenant claims. As with the breach of contract claims, the record of selective compliance with the Appraisal Schedule renders summary judgment on the implied covenant of good faith and fair dealing inadvisable. Furthermore, if as the Compatriot Parties contend the parties amended the Appraisal Schedule to permit use of the Freddie Mac mortgage appraisal as the third appraisal, the October 19 Emails do not expressly address whether the mortgage appraisal could be provided by the same appraiser that provided CCI's appraisal.[122] Drawing all reasonable inferences in favor of VGRP, it is possible that that CCI breached the implied covenant of good faith and fair dealing by failing to comply with obligations implied by the parties' agreed-upon three-appraiser process.

---

[121] *Supra* at n.90.

[122] Dkt. 416 Ex. A, Platt Dep. 66:23-67:6 ("[W]e were not aware nor was anyone aware at the time that that appraisal was going to be the same as CCI's, which we never would have agreed to.").

The Court also denies the Compatriot Parties' motion as to whether their refusal to approve a permanent mortgage breached the implied covenant of good faith and fair dealing. As noted above, the MP Managing Operating Agreement is ambiguous as to what obligations the Business Plan imposed upon the Compatriot Parties, if any. In the event that neither party prevails in establishing whether the MP Managing Operating Agreement imposed obligations on the Compatriot Parties to approve a permanent mortgage through the Business Plan, it is possible the Business Plan implied an agreement that the parties would enter into a permanent mortgage on terms consistent with those set forth in the Business Plan. At this stage, the Court cannot foreclose the Holtzman Parties' argument that the Compatriot Parties breached the implied covenant of good faith and fair dealing by refusing to consent to the Freddie Mac financing.

The application of the implied covenant is "rare and fact-intensive" and "turn[s] on issues of compelling fairness." *Cincinnati SMSA Ltd. P'rship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998). Given the incomplete factual record, the Court is unable to resolve the implied covenant issues at this stage. Accordingly, this portion of the Compatriot Parties' motion is denied.

53

### E. The Promissory Estoppel Claim

In Count II of the Complaint, the Holtzman Parties allege they were damaged by relying upon statements from a representative of the Compatriot Parties that induced them to pursue the loan commitment to acquire CCI's interest. The Compatriot Parties seek summary judgment on this claim and contend that these statements do not support a claim for promissory estoppel.

To prove a claim for promissory estoppel, a plaintiff must demonstrate that "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[123] A party seeking to establish promissory estoppel must do so by clear and convincing evidence. *Envo, Inc. v. Walters*, 2012 WL 2926522, at \*10 (Del. Ch. July 18, 2012), *aff'd*, 2013 WL 1283533 (Del. Mar. 28, 2013) (TABLE).

In their complaint and their summary judgment papers, the Holtzman Parties base their claim for promissory estoppel on a single representation.[124] That representation was a September 30, 2016 email from Mark Van Kirk, a Senior Vice President of CCI, to Jonathan Borenstein, an attorney for VGRP, stating that

---

[123] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000).

[124] Compl. ¶¶ 167-173; Holtzman Parties' Answering Br. 53-54.

there "is nothing stopping [Holtzman] from proceeding with his loan application immediately and exercising his purchase right now or in the near future."[125]  That representation cannot independently support a claim of promissory estoppel.  The statement that there "is nothing stopping [Holtzman] from proceeding with his loan application" cannot be reasonably interpreted as a definite and certain promise that the Compatriot Parties would approve any eventual loan.[126]

At oral argument, the Holtzman Parties raised a second representation in support of their claim for promissory estoppel, arguing that the "statements that are set forth in the agreements themselves" constitute statements upon which they rely for promissory estoppel.[127]  The Holtzman Parties now contend that the Business Plan is a "promise" that estops the Compatriot Parties from refusing to approve the Freddie Mac financing if it is ultimately determined that the Business Plan is "no

---

[125] Holtzman Parties' Answering Br. Ex. 6 at VGRP02027462.

[126] "The promise must be a real promise—mere expressions of expectation, opinion, or assumption are insufficient.  The promise must also be reasonably definite and certain." *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 804 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) (TABLE); *see also State v. Simpson*, 1990 WL 143837, at *2 (Del. Ch. Sept. 24, 1990) ("An essential element of promissory estoppel is that the promisor's representation must be reasonably definite and certain so that the intentions of the parties can be ascertained.").

[127] Dkt. 435, Tr. at 41:15-43:24.

longer a binding contract."[128]  This second basis for promissory estoppel was not alleged in the Complaint, nor was it raised in the Holtzman Parties' brief in opposition to summary judgment.  Therefore, it is waived.  *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 642 (Del. Ch. 2011) (ruling that an argument raised for the first time at a hearing was "not fairly or timely presented and was waived"), *aff'd*, 76 A.3d 808 (Del. 2013); *accord Hill v. LW Buyer, LLC*, 2019 WL 3492165, at *6 n.65 & *11 n.108 (Del. Ch. July 31, 2019).  Because the Holtzman Parties did not identify a promise that could reasonably be inferred to form the basis of a promissory estoppel claim, the Compatriot Parties' motion for partial summary judgment on Count II of the Complaint is granted.

## F.     Tortious Interference with Business Relations and Contract

In Count X of the Holtzman Parties' Complaint, Jonathan Holtzman, individually and derivatively on behalf of VGRP, asserts a claim against the Compatriot Parties for tortious interference in prospective business relations and tortious interference with contracts.  The elements of a claim for tortious

---

[128] *Id.* at 41:21-42:20 ("If [the Business Plan] is no longer a binding contract, it, nonetheless, constitutes a clear and definite promise to get to 80 percent financing."). Of course, the promissory estoppel claim could not survive if it were based on a valid contract. *SIGA Technologies, Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. 2013) ("Promissory estoppel does not apply, however, where a fully integrated, enforceable contract governs the promise at issue.").

interference with prospective business relations are "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages." *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) (internal citations omitted). "Under Delaware law, the elements of a claim for tortious interference with a contract are: '(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury.'" *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)) (emphasis omitted).

The Compatriot Parties argue that the Holtzman Parties have not pleaded or identified a "specific party or specific business opportunity" supporting a claim for tortious interference with a prospective business relationship.[129] The Compatriot Parties also argue that the Holtzman Parties have not identified a specific contract supporting a claim for tortious interference with a contract.[130] In both their Complaint and Answering Brief, however, the Holtzman Parties cite specific

---

[129] Compatriot Parties' Opening Br. 52-53.

[130] *Id.* 53-54.

parties, business opportunities, and contracts that form the basis of their claim for tortious interference.[131]

Although the information provided by the Holtzman Parties may not be as specific as the Compatriot Parties would like, the Compatriot Parties have not persuaded the Court that they are entitled to judgment as a matter of law. The Compatriot Parties must establish that there is no "'reasonable hypothesis'" upon which the Holtzman Parties could recover upon this theory.[132] The Compatriot Parties have not met that burden. The Compatriot Parties' motion for summary judgment on this Count is denied.

### G. The Civil Conspiracy Claim

The Compatriot Parties are entitled to summary judgment on the Holtzman Parties' claim of civil conspiracy.[133] The elements of a civil conspiracy claim are: "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage."[134]

---

[131] *See* Holtzman Parties' Answering Br. 54-57; Compl. ¶¶ 231-34.

[132] *In re El Paso*, 2014 WL 2768782, at *9 (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

[133] The Complaint mislabels two counts as Count XII (Conspiracy and Declaratory Judgment) and does not contain a Count XI. The Court will refer to the Conspiracy Count as Count XI and the Declaratory Judgment Count as Count XII.

[134] *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987).

In support of their civil conspiracy claim, the Holtzman Parties only cite to paragraphs of their Complaint.[135] The cited paragraphs of the Complaint do not contain any non-conclusory allegations that a civil conspiracy existed between any of the Compatriot Parties to injure Holtzman, and the Holtzman Parties do not cite evidence in the record to support the claim that such a conspiracy existed.[136] They also do not point to evidence that any "unlawful act" was performed "in furtherance of the conspiracy," as required to prove civil conspiracy.[137] Accordingly, because there is no disputed issue of material fact and the Compatriot Parties are entitled to judgment on this claim as a matter of law, summary judgment on this claim is granted.

## H. Challenge to the L.A.V. Sale and the Apartment Sale

As noted above, two transactions occurred during the pendency of this action: (1) CCI purchased L.A.V.'s minority interest in MP Operating through an intermediary entity, LAV MP Holding, LLC, and (2) CCI purchased the Apartments after a sale process conducted pursuant to an order in the Pennsylvania

---

[135] Holtzman Parties' Answering Br. 58 (citing Compl. ¶¶ 2, 94, 208-09, 223, 229).

[136] *See Am. Capital Acq. P'rs, LLC v. LPL Hldgs., Inc.*, 2014 WL 354496, at *12 (Del. Ch. Feb. 3, 2014) (granting a motion to dismiss a civil conspiracy claim because Plaintiffs only generally alleged that defendants conspired with each other to commit tortious interference and "the general rule that a corporation cannot conspire with its wholly-owned subsidiaries . . . must apply").

[137] The Holtzman Parties only cite conclusory allegations from the Complaint. *See* Holtzman Parties' Answering Br. 58 (citing Compl. ¶¶ 2, 94, 223, 229).

Action.  In their Complaint, the Holtzman Parties allege that the L.A.V. transaction violated Section 10.5 of the operating agreement of MP Operating (the "MP Operating Operating Agreement"), which states that "no . . . sale . . . or other transfer by a Member of its interest in the Company, or in any part thereof, or in all or any part of the assets of the Company shall be permitted without the express written consent of the other Member(s)."[138]

The Compatriot Parties argue that the Holtzman Parties do not have standing to pursue any claim resulting from a breach of the MP Operating Operating Agreement because none of the Holtzman Parties is a member of MP Operating. The Holtzman Parties counter, however, by asserting they are third party beneficiaries to the MP Operating Operating Agreement.[139]

Neither side has adequately briefed this issue.[140]  Accordingly, it "appears desirable to inquire more fully into the facts in order to clarify application of the law."[141]  Summary judgment on this part of Count XII of the Complaint is denied.

---

[138] Compl. ¶¶ 121-22, 211.  Compatriot Parties' Opening Br. Ex. RR § 10.5.  Prior to L.A.V.'s sale of its minority interests in MP Operating, the Members of MP Operating were MP Managing and L.A.V.

[139] Holtzman Parties' Answering Br. 59.

[140] *See Schultz v. QuantPower, Inc.*, 2018 WL 4492576, at *3 (Del. Ch. Sept. 19, 2018) (denying cross-motions for partial summary judgment as to claims that were not briefed adequately).

[141] *AeroGlobal*, 871 A.2d at 444.

## IV. CONCLUSION

For the foregoing reasons, the Compatriot Parties' motion for partial summary judgment is denied in part and granted in part. The Holtzman Parties' motion for partial summary judgment is denied. Counsel shall provide a form of order consistent with this Memorandum Opinion.